## IN THE UNITED STATES DISTRICT COURT DISTRICT OF COLORADO

**JOAN GRACE HARLEY,
CHRIS SEVIER, JOHN GUNTER JR,
WHITNEY KOHL,**

FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO
07/10/2017
JEFFREY P. COLWELL, CLERK

*Plaintiffs*

Case No:

**V.**

**MASTERPIECE CAKE SHOP LTD.,
JACK PHILLIPS**

*Defendants*

## COMPLAINT

*"Times Can Blind" Chief Justice Roberts dissenting in Obergefell*

### Introduction

1. NOW COMES, the Plaintiffs, one self-identified "machinists" and three self-identified "polygamists," for injunctive relief and damages against the Defendants for violating Title 24, Article 34, Part 6 (Discrimination in Places of Public Accommodation) as a result of discrimination on the basis of the Plaintiffs' self-asserted sex-based identity narrative or "sexual orientation," as members of the non-obvious suspect classes whose sexual orientation is different but legally equal to the sexual orientation of self-identified homosexuals. In short, the Defendants have been hauled into Court - once again - because they refused to design wedding cakes for the Plaintiffs' wedding ceremonies because the Defendants do not want to support the wedding ceremonies that do not involve "one man and one woman."

2. The Plaintiffs admit that when a person says that "love is love" or that "love wins" what they really mean is that they are "perfectly ok" with government assets being used to crush, harangue, socially ostracize, marginalize, and oppress anyone who believes that all forms of parody marriage are immoral, obscene, and subversive to human flourishing. The fact that such a

practice is categorically "unloving" does not matter thanks to the Supreme Court in *Obergefell v. Hodge*, 192 L . Ed. 2d 609 (2015) and the efforts of homosexuals masquerading as tolerant.  The Plaintiffs also want to use the government to prosthelytize the Defendants into converting to their worldview in  name of love and equality.  While this action proves that "people who are intolerant of intolerant people are intolerant," that (2) "people who are judgmental of judgmental people are judgmental," and that (3) "people who are dogmatic about not being dogmatic are dogmatic," the Plaintiffs nevertheless desire to exercise the same rights under C.R.S  24-34-601 et. seq  to crush, harangue, oppress, marginalize, and ostracize the Defendants for refusing to abandon their Christian faith and for failing to show adequate respect to the Plaintiffs personal religious beliefs about marriage, sex, and morality.

3. For better or worse, the Plaintiffs ultimately want to receive the exact same legal treatment under the laws, such as C.R.S 24-34-601 et. seq, as afforded to individuals who self-identify as homosexual at all cost, even if it means that no one is afforded protection for sexual orientation civil rights due to their self-asserted sex-based identity narrative.  This action is straightforward: if C.R.S  24-34-601 et. seq protects self-identified homosexuals from discrimination on the basis of their self-asserted sex-based identity narrative, then the statute must equally protect self-identified polygamists and machinists on the basis of theirs - period.  If C.R.S 24-34-601 et. seq  does not protect self-identified polygamists and machinists, then the statute cannot protect self-identified homosexuals either and this Court and the Supreme Court must de facto invalidate all statutes that seek to protect sexual orientation as a matter of civil rights to include C.R.S 24-34-601 et. seq, transgender bathroom policy, California's travel ban policy, and the current legal definition of marriage itself.  It is not difficult to understand legal concept and the Courts

are not going to be permitted to just make up the law "as they go along." After all, we have a

"written Constitution" not a "living Constitution." See *Obergefell*, 192 L . Ed. 2d 609 at 7

(Thomas Dissenting) on originalism. See *Obergefell* at 26 (Roberts Dissent) quoting "Rehnquist,

The Notion of a Living Constitution, 54 Texas L. Rev. 693, 700 (1976). Either C.R.S

24-34-601 et. seq is unconstitutional for violating the First Amendment Establishment Clause

under the lemon and coercion tests as to all individuals or, alternatively, no individual can be

discriminated against for their self-asserted sexual orientation no matter how morally repugnant

or silly that anyone - to include the government - might find it to be based on their feelings and

opinions. *Lynch v. Donnelly,* 465 U.S. 668, 687-94 (1984)(lemon test); *Lee v. Weisman*, 505

U.S. 577 (1992); *School District v. Doe*, 530 U.S. 290 (2000); *County of Allegheny v. ACLU*, 492

U.S. 573 (1989)(coercion test). *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 27879,

96 S. Ct. 2574, 2578, 49 L. Ed. 2d 493 (1976)(14th Amendment applies to all individuals in even

non-obvious suspect classes)

4. In his dissent read from the bench in *Obergefell*, the Honorable Chief Justice Roberts already

admitted that if "gay rights" are "civil rights" then "polygamy rights" are also "civil rights" by

asserting the following:

 "Indeed, from the standpoint of history and tradition, a leap from opposite-sex marriage to
same-sex marriage is much greater than one from a two person union to plural unions, which
have deep roots in some cultures around the world. If the majority is willing to take the big leap,
it is hard to see how it can say no to the shorter one. It is striking how much of the majority's
reasoning would apply with equal force to the claim of a fundamental right to plural marriage. If
"[t]here is dignity in the bond between two men or two women who seek to marry and in their
autonomy to make such profound choices," *ante*, at 13, why would there be any less dignity in
the bond between three people who, in exercising their autonomy, seek to make the profound
choice to marry? If a same-sex couple has the constitutional right to marry because their children
would otherwise "suffer the stigma of knowing their families are somehow lesser," *ante*, at 15,
why wouldn't the same reasoning apply to a family of three or more persons raising children? If
not having the opportunity to marry "serves to disrespect and subordinate" gay and lesbian
couples, why wouldn't the same "imposition of this disability," *ante*, at 22, serve to disrespect

and subordinate people who find fulfillment in polyamorous relationships? See Bennett, Polyamory: The Next Sexual Revolution? Newsweek, July 28, 2009 (estimating 500,000 polyamorous families in the United States); Li, Married Lesbian "Throuple" Expecting First Child, N. Y. Post, Apr. 23, 2014; Otter, Three May Not Be a Crowd: The Case for a Constitutional Right to Plural Marriage, 64 Emory L. J. 1977 (2015)." *Obergefell* at 21 (Justice Roberts Dissenting).

5. The Chief Justice's position in light of the facts presented demonstrate that the Plaintiffs have standing.

## PARTIES

6. Plaintiff Grace is a former transgender who now self-identifies as a polygamist. (See Declaration of Grace) Plaintiff Grace lived as a transgender for 18 years. (See Declaration of Grace) She grew up as "Joan the woman," then became "Joe the man," and has now transformed back into "Joan the woman again" in accordance with her birth gender.  She was once married to a female before converting to a new sex-based identity narrative. She now self-identifies as a polygamists.  Plaintiff Grace intends to have 38 wedding ceremonies in 38 different states. Each one of her separate written demands that the Defendants design different cakes for those ceremonies was denied due to religious conviction held by the Defendants that come from the same source that serves as the master narrative of the United States Constitution and rule of law itself: the radically transformative New Testament Gospel and the personalized truth of Jesus Christ.  Plaintiff Grace admits that the Defendants do not consider themselves to be morally superior to anyone but the Defendants have made it clear that they believe that to advance an event that does not check out with our natural design is itself an act of immorality that violates Biblical law that was the cornerstone of this Nation from its inception. The Defendants believe that marriage between "one man" and "one woman" is sacred and set apart and that all other

forms of marriages are factually inferior, amounting to parody marriage in light of self-evident truth and morality in accordance with the reasonable person of ordinary prudence standard.

7. Plaintiff Gunter self-identifies as a polygamist, which is his controlling self-asserted sex-based identity narrative. He plans to hold 38 wedding ceremonies in 38 different states to celebrate his beliefs and feelings on marriage, sex, and morality. Plaintiff Gunter put in 38 separate requests for the Defendants to design different wedding cakes for his ceremony and his request were denied because the Defendants believe that "silence in the face of evil is to cooperate with it," just like Dietrich Bonhoeffer believed before the Nazis killed him for refusing to convert to their religious views on morality too which was culturally popular at the time in his country.

8. Plaintiff Kohl was at one point engaged to a man. But she got really hurt by members of the opposite-sex. She then converted to a new identity narrative, electing to self-identify as a "lesbian." She then legally married a woman only to realize that marrying a member of the same-sex was hell on earth. She now self-identifies as a polygamists. Plaintiff Kohl sent 38 separate demands that the Defendants design 38 different wedding cakes for 38 distinct wedding ceremonies she plans on holding in 38 states. However, the Defendants refused to design the wedding cake because they have the humility to believe that truth is absolute and that to encourage an individual in a course of conduct that does not check out with the truth about the way humans are designed and the way things are in general is itself an insurmountable act of wrongdoing that is categorically subversive to human flourishing and corrosive to community standards of decency. That is, the Defendants believe that to support parody marriage wedding events is wrong in that the ceremonies normalize false permission giving beliefs about sex that decreases the quality of life, erodes consent, proliferates immeasurable darkness, promotes

obscenity, is immensely sexually desensitizing, and confuses the youth immeasurably.  Just like

homosexuals, Plaintiff Kohl believes that nobodies version of morality matters as a basis for law

and policy except the one that she personally believes as a result of her over conformity to

society's messages and cultivated self-entitlement syndrome.  Plaintiff Kohl expects this Court to

ratify her moral superiority complex just as prior courts have ratified the homosexual litigants

imperialistic moral superiority complex in the name of tolerance, love, and equality, knowing at

all times that it would lead to the persecution of Christians as it continues to do.[1]

9.  Plaintiff Sevier is a former Judge Advocate General and Assistant United States Attorney,

who was commission to serve on the rule of law mission in a foreign theater of war and in other

venues by the DOJ and DOD.  Because of his beliefs and values, Plaintiff Sevier has been

subjected to countless fake and phony controversies in different venues in the same manner that

filmmaker Dinesh d'Souza experienced and for the same reason: "politics" predicated on the idea

that the ends justify the means in accordance with Saul Alinsky rules for radicals tactics in the

pathetic attempt to silence and discredit his positions.  Plaintiff Sevier works directly with

countless state and federal legislatures on a litany of legislative matters to include the ones

---

[1] Kim Davis chooses jail.
http://www.nytimes.com/2015/09/04/us/kim-davis-same-sex-marriage.html?_r=0;
 The Honorable Judge Roy Moore suspended from office: Alabama chief justice faces removal over gay marriage
stance
http://www.al.com/news/index.ssf/2016/05/alabama_chief_justice_roy_moor_10.html
 Vanderbilt Conservative Professor targeted by offended student.
http://www.infowars.com/now-at-vanderbilt-conservative-professor-targeted-by-offended-students/
Gays Hating Ex-Gays: Wayne Besen's Verbal Assault on Greg Quinlan
http://americansfortruth.com/2009/04/13/gays-hating-ex-gays-wayne-besens-verbal-assault-on-greg-quinlan/
Ex-Fire Chief Dismissed for His Faith Testifies at Religious Liberty. Hearing
http://www1.cbn.com/cbnnews/us/2016/july/ex-fire-chief-dismissed-for-his-faith-testifies-at-religious-liberty-hearing?cpid=:ID:-12100-:DT:-201
6-07-13-12:06:54-:US:-JG1-:CN:-CP1-:PO:-GC1-:ME:-SU1-:SO:-FB1-:SP:-NW1-:PF:-TX1-
Then I was sued: read passionate defense from grandma florist sued for refusing to service gay wedding.
http://dailycaller.com/2015/11/11/read-passionate-defense-from-grandma-florist-sued-for-refusing-to-service-gay-wedding/
Baker owners refuse to pay damages in gay wedding cake case.
http://www.foxnews.com/us/2015/10/01/oregon-bakery-owners-refuse-to-pay-damages-in-gay-wedding-cake-case.html
Judge fines Christian farm owners for refusing to host gay wedding.
http://www.theblaze.com/stories/2014/08/21/judge-fines-christian-farm-owners-13000-for-refusing-to-host-gay-wedding/

directly at issue here because they are unmoved by the pathetic tactics of the radical left.

Plaintiff Sevier self-identifies as a "machinists." His self-asserted sex-based identity narrative or

sexual orientation is that he prefers to marry a machine only to then force everyone in society to

see his object of affection as his spouse.  Plaintiff Sevier plans to have 38 wedding ceremonies in

38 states and specially demanded that the Defendants design 38 seperate wedding cake for each

one of those scheduled events, advancing Plaintiff Sevier's gospel narrative on marriage, sex,

and morality. The Defendants denied each one of Plaintiff Sevier's written and oral request to

design wedding cakes because the Defendants think Plaintiff Sevier's sexual orientation is

morally repugnant and detrimental to his own best interests and the interest of the public's

health, safety, and welfare. The Defendants believe that to encourage someone in a course of

conduct that is wrong is itself an intolerable act of wrongdoing; yet, Plaintiff Sevier does not care

about the Defendants' convictions, he only cares about his convictions and expects the Court to

only care about his as well in the name of love, equaliy, and tolerance.   To the same extent

afford to those individuals who self-identify as homosexual under the law, Plaintiff Sevier wants

to use the government to proselytize and force convert individuals, like the Defendants, into

adopting his personal beliefs and feelings about marriage, sex, and morality so that Plaintiff

Sevier can officially feel less inadequate and ashamed about his lifestyle choices and religious

worldview.

10. Defendant Masterpiece Cakeshop Ltd is a business located in the state of Colorado and is

subjected to Colorado law to include C.R.S 24-34-601 et. seq. This is not the first action in

which Masterpiece Cakeshop has been accused of discriminating on the basis of sexual

orientation.  But it may be the last sexual orientation discrimination action for cause since it can

set a precedent that accords with the truth regarding "sexual orientation" ideology and brings

forth which Constitutional prescription is actually controlling.

11. Defendant Phillips is a founder of Masterpiece Cakeshop Ltd. As a matter of humility and

authentic conviction, Defendant Phillips self-identifies as a "Christ Follower," who treats Jesus

like as a King and the Bible as the infallible living word of God.  The Defendants believe that the

Bible amounts to a verifiable yard stick and compass upon which they submit to by choice in

faith in response to God's love for themselves and humanity in general.  The fact that the

founding Fathers also relied on the same Bible as the basis for law itself is of no consequence

because, like homosexual litigants, the Plaintiffs take on sex, marriage, and morality is superior

because "they say so" in step with the unexamined assumption of the superiority of our cultural

moment and the modern view promoted by the cultural elite in Hollywood and academia.

Defendant Phillips sincerely believes that he is a "sinner" and that 2000 years ago Jewish refugee

in the middle east claiming to be the Son of God voluntarily died for his sins and the sins of all

mankind, to include the Plaintiffs, following a sham trial by a corrupt court, only for the

decedent to subsequently resurrect after three days, offering the promise eternal life as free give

to everyone who believed upon him as their personal Lord and savior, repent of their sins, and

become born again through the Baptism of the Holy Spirit.  By agreeing to become covered in

the blood of the lamb, Defendant Phillips believes that this redeemer, Jesus Christ, is the ultimate

atoner that bridges the gap to a personal relationship and direct access with the very Creator, who

is expressly referenced in the Bill of Rights and is often referred to as the perfect Father, who

balances justice, mercy, and grace.  It is out of response to Defendant Phillips understanding of

God's radical sacrificial love for him that he adopted on faith that compels Defendant Phillips to

unapologetically and willing to subject himself, his family, and his business to unyielding

harassment, social ostracism, and persistent persecution that was at all times foreseeable to the

Supreme Court in breathtaking cases like *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015) and

*United States v. Windsor*, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).[2] As priest of moral

relativism, the Majority on the *Obergefell* Court were "unmoved by th[e] inevitability" that by

shoehorning self-asserted sex-based identity politics into the 14th Amendment civil rights

narrative would cultivate a "chilling effect." The Plaintiffs demand that this Court also be

"unmoved by this inevitability" and further advance the "chilling effect," since the Plaintiffs

believe, like homosexuals, that they are on the right side of history and reality, if sexual

orientation really does involve civil rights.  The Plaintiffs are determined to use Title 24, Article

12, Part 6 (Discrimination in Places of Public Accommodation) C.R.S  24-34-601 et to impose a

"chilling effect" on the Defendants for not abandoning their identity narrative as Christ

Followers and not converting to moral relativism by ratifying the Plaintiffs' worldview if and

only if these matters are civil rights ones in accordance with the 14th amendment and not

ultimately controlled by the First Amendment Establishment Clause under the lemon test and

coercion test.

## JURISDICTION AND VENUE

---

[2] Defendant Phillips clearly believes that "obedience" is God's love language.  Defendant Phillips believes that it would be disobedient to his religious identity narrative as a Christ Follower to design wedding cakes in furtherance and support of events that amount to parody weddings and critiques on absolute truth.  Defendant Phillips religious beliefs are entirely exclusive in that he believes that the only way to heaven and a relationship with God is through a personal relationship with Jesus Christ and that all other religions are objectively flawed, irrational, empty, depersonalizing, shallow, narrow, exclusive, dehumanizing, and intellectually dishonest.  However, Defendant Phillips beliefs in the personalized truth of Jesus Christ are entirely inclusive insofar as everyone - to include the Plaintiffs - is invited to enter into a personal relationship with a redeemer Jesus Christ, the Holy Spirit, and God in a manner that is overflowing with transcending liberation and unrelenting peace.

14. The Plaintiffs bring their complaint under federal diversity jurisdiction, 28 U.S.C. 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.The Defendants are domiciled in Colorado. The Plaintiffs are not. However, the Plaintiffs reached into Colorado to do business with the Defendants in separate transactions and sustained a multitude of personal injuries.

## FACTS

15. On June 26, 2017, the Plaintiffs called Defendant Phillips and demanded that he design 152 different wedding cakes for 38 distinct wedding ceremonies in 38 different states in support of the Plaintiffs beliefs about sex, marriage, and morality.

16. The Plaintiffs offered to pay the Defendants more than $500 for each cake design in a manner that totaled more than $75,000 that would support their wedding event and their religious worldviews on marriage and truth.

17. The Defendants rejected the Plaintiffs' offers in separate transactions exclusively on the basis that the Defendants believe that all forms of parody marriage beyond actual, self-evident, neutral, non-controversial marriage between "one man and one woman" are all equally immoral, obscene, and subversive to human flourishing, depersonalizing, dehumanizing, removed from reality, oppositional to community standards of decency, and antagonistic towards absolute truth. That is, the Defendants, while knowing the full implications of C.R.S 24-34-601 et. seq denied each of the Plaintiffs' separate and distinct demands to design wedding cakes in support of different events exclusively because the Defendants do not want to affirm, ratify, nor support the plausibility of the sex-based self-asserted identity narratives adopted by the Plaintiffs based on their personal feelings and their over conformity to society's messages and influences.

18. The Defendants denial of the Plaintiffs' offers was exclusively made on the basis of the Plaintiffs' self-asserted sexual orientation, which the Defendants apparently believe is as equally not worthy of support as man-man and woman-woman marriage, which are just as unnatural and objectionable as theirs, according to the Defendants. By denying the Plaintiffs request, it is clear that the Defendants are not merely singling out homosexuals in refusing to provide artistic services to support their matrimonial events. The Defendants only feel lead to support marriage events between "one man and one woman," even if the opposite-sex couple are not Christians. The Defendants believe that man-woman marriage is simultaneously secular in nature, uncontroversial, and spiritual in nature and that all other forms of marriage are critiques of Christianity and absolute truth to the point that to support them is an act of immoral wrongdoing that is simply intolerable for objective justifiable cause based on the reasonable person standard of ordinary prudence.

19. If C.R.S 24-34-601 et. seq is valid law, the Plaintiffs have suffered personal injury as a result of Defendants willful discrimination. The Defendants defiantly continue to put a higher and divine law above laws like C.R.S 24-34-601 et. seq which was passed into law by moral relativist in exchange for self-serving political clout.

20. For better or worse, the Plaintiffs in this action simply want to be treated the same under the law as those individuals who self-identify as homosexual. That is, the Plaintiffs want to possess the same legal rights to harangue, abuse, marginalize, vilify, oppress, and socially ostracize the Defendants and anyone else who does not support their personal beliefs and thoughts about morality, sex, and marriage, to include the Defendants, if and only if self-identified homosexuals have those same rights.

21. Prior to this action, the Defendants were sued by two self-identified homosexuals, who believe that they are actually husband and wife, for violating C.R.S  24-34-601 et. seq after the Defendants refused to design a wedding cake in furtherance of a man-man wedding ceremony. Two different Colorado State Courts found that the Defendants violated the C.R.S 24-34-601 et. seq with a straight face. The matter is now pending before the United States Supreme Court. Nevertheless, the Defendants remain as defiant as Dr. King in the face of segregation laws and on the same authoritative basis - the Bible. Dr. King was not advocating that the United States laws be less Christian, he was pushing for the United States to return to a deeper Christianity.

22.  In an ambush telephonic initiated by the Plaintiffs the day that the Supreme Court elected to hear the Defendants other case brought by tolerant homosexuals, the Defendants made the following positions clear. Defendant Phillips believes that Jesus Christ was who he said he was. He believes that there are laws that are woven into the fabric of the universe and the justice is not arbitrary but objective.

23. Despite Defendant Phillips beliefs, the Plaintiffs demand that the Defendants take a scalpel to the Bible and arrogantly cut out sections that do not accord with the modern cultural narrative. The Defendant indicated that the Bible was transcultural, and that to rewrite the Bible to try to fit modern times would be the same as converting to the religion of moral relativism, which the Defendants showed no interest in doing to the shock and horror of the Plaintiffs.[3] The Defendant indicated that he would not revise the Bible to conform to the unexamined assumption of our cultural moment, implying that cultural rules were almost always shallow, narrow, exclusive,

---

[3] The Plaintiffs are joining their brothers adn sisters in the homosexual church and demanding that the Defendants recreate God in the image that they say he should be instead  of the image asserted by God in the Bible. http://christiannews.net/2017/06/26/lesbian-woman-creates-lgbt-bible-app-to-promote-inclusivity-within-the-church/

already out of date, and already on their way out.  The Defendants asserted that their beliefs in

Jesus Christ and the Bible are transcultural and that they cut across time and space.

24. When the Plaintiffs ask the Defendant if he believed that "love is love," Defendant Phillips

respectfully said that the assertion was circular and made no sense and that "love" without

"truth" is "shallow sentimentality." The Defendant implied that he was an ambassador of the

truth who was following the lead of Jesus Christ, as an agent of light, who was willing to stand in

his shoes to incur persecution to point others towards a path of transcending freedom marked

with living hope that comes from having a relationship with the personalized truth of Jesus.

Defending Phillips implied that if "a man really loved a man" he would encourage that man to

become a better man of character for his future wife someday, and if a woman "really loved a

woman" she would push for her to become a better woman of virtue so that she could be a better

spouse for her husband someday and that the same principles applied to man-object and

man-multiperson marriage, since they were also unions that did not check out with the givenness

of our nature and the way things are either.

25. By becoming a Christian, by very definition, Defendant Phillips admitted that he himself is a

broken sinner who is in need of a savior and that he simply "sins differently" than the Plaintiffs.

The Plaintiffs admit that Defendant Phillips did not show any form of moral superiority in

holding fast to his beliefs in denying the Plaintiffs demands that he abandon his faith and

conviction and convert to a narrow form of moral relativism or else face a variety of government

authorized punishments. But the Plaintiffs do not care and want to force convert the Defendants

to their worldview so that they feel less inadequate about their beliefs and indentity narrative.

26. When the Plaintiffs asked the Defendant if he thought he was "better than them" for not "thinking about marriage like they do," the Defendant indicated that at the center of Christianity is a man who claimed to be God dying on the cross while forgiving his enemies and telling his followers, like Defendant Phillips, to do the same. The Defendants were resolved to demonstrate that Christianity is a set of truth claims that humbles its followers and unlike the religions of moral relativism and the works-based righteous religion of Islam, which lead to the very kind of targeted oppression on display here and in the companion case brought by the homosexuals against the Defendants for the same offense. "Christianity" is the only religion that does not naturally lead to violent oppression and systemic marginalization of individuals who disagree with its truth claims, according to the Defendants. Nevertheless, the Plaintiffs want to use government to crush the Defendants for refusing to support their beliefs on marriage, sex, and morality because the Plaintiffs feel that their beliefs are superior as a matter of pride.

27. In the instant case, Defendant Phillips told the Plaintiffs that they were welcomed to come into his shop and buy anything that they wanted and that they were also invited to come to know Jesus if they wanted to. The Defendants made clear that they would not abandon their beliefs and convictions in Jesus as the Son of God and redeemer of the world. The Defendant stated that "if he did not allow sinners to shop at his store, then he himself could not shop there - in fact no one could" - to include lawyers. Defendant Phillips made the distinction that he believe it would violate God's law to support any form of parody marriage events other than events involving a marriage between "one man and one woman."

28. The Defendants indicated to the Plaintiffs that (1) the State and Federal Government from the inception of this nation has recognized that "sex" is powerful, that (2) this is why our

government as passed obscenity codes and anti-sex trafficking statutes, and that (3) a government that "loves its people" will fashion laws that channel the sexual energy of its citizens in manner that accords with the givenness of our nature, in step with "the way things are" and "the way we are."

29. Defendant Phillips indicated to the Plaintiffs that (1) "sex" is not "dirty" nor "inherently bad" because, after all, "God made it," that (2) Defendant Phillips simply believes that sex was best designed to be carried out within the confines of covenant marriage between "one man and one woman," that (3) all forms of parody marriage beyond actual marriage between one man and one woman are immoral, obscene, and subversive to human flourishing, cultivating devastating opportunity cost that decrease the quality of life for those who buy into the irrational and self-serving ideology floated by the philosophers on the Voice and at MTV; and that (4) for the Defendants to encourage parody marriage events is an act insurmountable unwise moral wrongdoing in and of itself that violates his identity narrative as a Christ Follower, which he refuses to abandon at all cost no matter how many threats the Plaintiffs throw at him.

30. Plaintiff Sevier admits that he has the same procreative potential with a machine that self-identified homosexuals have with each other. Yet, the same cannot be said of the polygamists Plaintiffs.

31. The Plaintiffs believe in the science of dopamine, oxytocin, serotonin, and beta fosb that whatever a person "has sex with" they "bond with."

32. For either being ex gays or for self-identifying as a sexual orientation that is really part of the true minority of sexual orientation, the Plaintiffs in this action have been mercilessly persecuted and targeted by homosexuals who feel that their identity narratives make theirs look less

credible, which is a threat to what could have at all times been a complete political and judicia

scam that is a threat to American Democracy.[4]

## QUESTIONS PRESENTED AND THE NATURE OF THE CASE
### Prospectively Changing The Constitutional Narrative

33. This case is unique insofar as the prior courts may be as equally on trial as the Defendants for

their judicial malpractice and intellectual dishonesty in wrongfully shoehorning sex-based

identity narratives into the civil rights narrative in order to justify their personal beliefs that are

legally unrecognizable by the Federal and State government under the 1st Amendment

Establishment Clause. Accordingly, for the benefit of this Court and perhaps the court of public

opinion, the Plaintiffs feel compelled to identify several legal questions presented by this action

that may be resolved in this action involving civil rights and freedom of speech. The Plaintiffs

may have to have a come to Jesus meeting of their own with the judiciary for the prior court

decisions.

## (a)  Question Presented:  Does The 14th Amendment Or the 1st Amendment Inform The Government How To Address Self-Asserted Sex-Based Indentity Narratives?

34. The paramount questions presented in this action is whether sex-based self-asserted identity

narratives or "sexual orientation" are really based on "immutability" and is therefore governed

by civil rights statutes, like Title 24, Article 34, Part 6, and the 14th amendment or whether

"sexual orientation" ideology a religious dogma that absolutely bars the state and federal

government from legal recognition under the 1st Amendment Establishment Clause entirely?

That is, the most important question is in this action is which Constitutional narrative is actually

controlling as to self-asserted sex-based identity narratives - the 1st amendment or the 14th

---

[4] http://www.thedailybeast.com/meet-the-anti-lgbt-bigot-marrying-his-computer

amendment? It could be the case that if anyone has been playing pretend in these actions it has at all times been the moral relativist on the bench - no matter how well intended on the surface.

**(b)  Are Self-Asserted Sex-based Identity Narratives Really Governed By The 14th Amendment And Are They Really A Matter Of Civil Rights?**

35. Take the civil rights 14th amendment question concerning self-asserted sex-based identity narratives: the question is do all individuals warrant equal protection and substantive due process rights to not be discriminated against on the basis of their sexual orientation as the Supreme Court held in *Obergefell v. Hodge,* 192 L. Ed. 2d 609 (2015), and as Title 24, Article 34, Part 6 implies? For example, if marriage based on self-asserted sex-based identity narratives is a "fundamental right," "individual right," "existing right," based on a "personal choice" for homosexuals, then clearly it is also a "fundamental right," "individual right," "existing right," based on a "personal choice" for polygamists, zoophiles, and machinists. *Zablocki v. Redhail,* 434 U.S. 374, 384 (1978) (fundamental right); *Cleveland Bd. of Educ. v. LaFleur,* 414 U.S. 632, 63940 (1974) (personal choice); *Loving v. Virginia,* 388 U.S. 1, 12 (1967) (existing right/individual right); *Lawrence v. Texas,* 539 U.S. 558 (2003) (intimate choice). If individuals who self-identify as homosexual can successfully sue a baker under Title 24, Article 34, Part 6 as two Colorado State Courts already held, then very obviously self-identified polygamists and machinists can sue a baker for the same offense as it applies to them on the same legal basis.  If "sexual orientation" really is a matter of "civil rights," like race is, then all individuals are protected from discrimination on the basis of their self-asserted sexual orientation as matter of civil rights to include those in the non-obvious class which includes the Plaintiffs. *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 27879, 96 S. Ct. 2574, 2578, 49 L. Ed. 2d 493 (1976)(even the most non-obvious subdivisions within a suspect classes cannot be discriminated

against - whites cannot be discriminated on the basis of race either).  Otherwise, what is taking

place is that moral relativist in office are monkeying with the 14th Amendment in a manner that

really is a "threat to American Democracy" as part of an actual "egotistic....judicial putsch" in

manner that constitutes judicial and political malpractice and actionable racketeering in sedition

and treason in violation of 18 U.S. Code § 238, which must be acted upon by the Senate

Judiciary committee and the Department Of Justice in the restoration of the rule of law.  It would

be no wonder that Chief Justice Roberts stated "just who do we think we are" as he read his

dissent from the bench in *Obergefell* if these matters were never really civil rights matters to

begin with.  *Obergfell* at 3 (Roberts Dissenting).  The Honorable Chief Justice Roberts already

correctly admitted that since "gay rights" are allegedly "civil rights," then all other sexual

orientation no matter how peculiar and morally repugnant must also enjoy those same civil rights

at all costs.  *Obergefell* at 21 (Justice Roberts Dissenting). Just because homosexuals are the

largest minority within sexual orientation does not mean that the Plaintiffs are not entitled to the

same civil rights, simply because their sexual orientation is less popular, after all "a bare . . .

desire to harm a politically unpopular group cannot justify disparate treatment of that group."

*Romer v. Evans*, 517 U.S. 620, 635 (1996).  The Plaintiffs do not care if the prior courts feel

embarrassed by what could be hardcore intellectual dishonesty and judicial malpractice. The

simple fact is that the courts in general cannot have it both ways, if homosexuals can claim

protection under Title 24, Article 34, Part 6, then so can the Plaintiffs based on their personalized

self-asserted sex-based identity narrative no matter whether anyone thinks that their lifestyle is

morally repugnant or not. That is a major question presented here and as the Court answers this

quesiton it should remember that "the legitimacy of the courts ultimately rests "upon the respect

accorded to its judgments." *Obergefell* at 19 (Roberts Dissenting) quoting *Republican Party of Minn. v. White,* 536 U. S. 765, 793 (2002) (KENNEDY, J., concurring).

36.  In terms of substantive due process rights, the Plaintiffs stipulate for the record that polygamy and machinism are equally not part of American tradition as homosexuality and that hey should be afforded the same substantive due process rights as individuals who self-identify as homosexual. *Washington v. Glucksberg,* 521 U. S. 702, 721 (1997); *District Attorney's Office for Third Judicial Dist.* v. *Osborne*, 557 U. S. 52, 72 (2009); *Flores*, 507 U. S., at 303; *United States* v. *Salerno*, 481 U. S. 739, 751 (1987); *Moore* v. *East Cleveland*, 431 U. S. 494, 503 (1977).[5]

### (c) Question Presented: Are Self-Asserted Sex-Based Identity Narratives Governed By The 1st Amendment Establishment Clause Under the Lemon Test and Coercion Test?

37. Here is another paramount question presented in this action: if "sex" or "sexual preference" is "fluid" and not based on "immutability" like skin "pigmentation" as several ex gays are testifying under oath in this action, the paramount question presented is whether legally recognized gay marriage policy and statutes like Title 24, Article 34, Part 6  are at this very instance unconstitutional under the coercion test and lemon test associated with the First Amendment Establishment Clause? *Lynch v. Donnelly,* 465 U.S. 668, 687-94 (1984); *Lee v. Weisman*, 505 U.S. 577 (1992); *School District v. Doe*, 530 U.S. 290 (2000); *County of Allegheny v. ACLU*, 492 U.S. 573 (1989)(See DE_Pastor Cothran ¶¶ 1-50;; DE _ Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-21).   That is, does Governmental policies that seek to enshrine the doctrinal orthodoxy inherent within self-asserted sex-based identity narratives which "close minds" and "ends debates" are invalid

---

[5] http://conservativetribune.com/mans-lawsuit-gay-marriage/

under the lemon test and coercion test of the First Amendment Establishment Clause because

self-asserted sex-based identity narratives are inherently predicated on a series of unproven faith

based assumptions and naked assertions that are at the very least implicitly religious and can

only be taken on faith? (See DE_Pastor Cothran ¶¶ 1-50;; DE _ Quinlan ¶¶ 1-37, DE _Dr. King

¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-21).  If so, this Court must decide if

the Federal and State Government are at this instance prohibited from legally recognizing

identity narratives and enforcing policies that do under the Constitutional prescription afforded

by the First Amendment Establishment Clause. *Lynch v. Donnelly,* 465 U.S. 668, 687-94 (1984);

*Lee v. Weisman*, 505 U.S. 577 (1992); *School District v. Doe*, 530 U.S. 290 (2000); *County of*

*Allegheny v. ACLU*, 492 U.S. 573 (1989). Perhaps there was a reason why the 1st Amendment

came before the 14th Amendment.

38. Unlike homosexuals, the Plaintiffs are interested in the truth and not merely their selfish

interests, having concern for the welfare of the Nation and not just curing their personal injury to

their dignity interests.  The Plaintiffs have provided sworn statements from former homosexuals

who attest that homosexity is part of the religion of moral relativism since it is predicated on a

series of unproven faith based assumptions and naked assertions that are implicitly religious,

which this Court will not be allowed to ignore even if doing so was politically expedient at one

point. (See DE_Pastor Cothran ¶¶ 1-50;; DE _ Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22

Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-21). While there is no real proof of that a "rape gene"

exists, there is no real proof that "gay gene" exist either. (See DE_Pastor Cothran ¶¶ 1-50;; DE _

Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-21)

21

(See study from John Hopkins).[6] The question as to whether homosexuality, polygamy,

machinism, and zoophilia orthodoxy is plausible is not at issue nor is it even remotely

appropriate for the Court nor the Defendants to decide that. The question presented is whether

homosexuality, polygamy, machinism, zoophilia, and any other self-asserted sex-based identity

narrative are inherently"religious in nature," since they are moral valuations?  If so, the Court

may be required to find that the federal and state government is at this very moment barred from

enforcing Title 24, Article 34, Part 6 and from even legally recognizing gay marriage under the

lemon test and coercion test of the First Amendment Establishment Clause. (See DE_Pastor

Cothran ¶¶ 1-50;; DE _ Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE

_Dr. Cretella ¶¶ 1-21).  If the First Amendment is controlling on these matters, it means that the

entire fake gay civil rights movement is officially in crisis and must inevitably collapse in on

itself completely under the weight of the Establishment Clause.  That does not mean that

individuals cannot self-identify as a homosexual, unicorn, or whatever they want, but it does

mean that the neither the Federal nor State can legally recognize or even deal with self-asserted

sex-based identity narratives whatsoever. These are questions presented in this action that must

be answered by the Court that the Plaintiffs feel compelled to point out.

39. Just as the 10th Circuit has held that "atheism is a religion," this Court must determine if

self-asserted sex-based identity narratives are inherently religious in nature and therefore legally

unrecognizable by both the state and federal government.[7] *Wells v. City and Cnty. of Denver*, 257

---

[6] http://www.cnsnews.com/blog/michael-w-chapman/johns-hopkins-psychiatrist-there-no-gay-gene

[7] While there is nothing inherently controversial about secular, neutral, dictionary defined marriage between one man and one woman, it must be determined if man-man, woman-woman, man-object, man-animal, and man-multi-person marriages are all equally forms of parody marriage that are not secular in nature but are predicated on a series of unproven faith based assumptions that are inherently religious.

F.3d 1132 (2001). Very obviously, the reason why in *Van Orden v. Perry*, 545 U.S. 677 (2005),

Justice Breyer, in his concurrence, stated that "the Establishment Clause does not compel the

government to purge from the public sphere all that in any way partakes of the religious" because

"[s]uch absolutism is not only inconsistent with our national traditions, but would also tend to

promote the kind of social conflict the Establishment Clause seeks to avoid" was because he

knew, that western postmodern moral relativism, expressive individualism, and secularism are a

implicitly religious. "Secularism" is having a full blown crisis in that modern "secularism" is not

"secular" whatsoever, it is "religious" and rife with a series of unproven faith based assumptions

that can only be taken on faith.

40. All "religion" amounts to is a set of questions as to "why we are here" and "what we should

be doing as humans." It is impossible to keep religion out of the public square, since everyone

brings their own worldview into the public square with them. The First Amendment

Establishment Clause was never just designed to single out institutionalized religions but also

targeted unofficial orthodoxies that also consider of unproven truth claims that can only be taken

on faith. It should be determined by this Court if it takes a lot of religious faith to believe that a

"man" can marry a "man" and force everyone in society to see "that man" as his "wife" or else

the government will "get you" and whether such a contention accords with actual fundamental

rights afforded by the United States Constitution or whether it is wildly unconstitutional.

18. If the Court were to find that self-asserted sex-based identity narratives never should have

been shoehorned into the 14th Amendment narrative to begin with and that Title 24, Article 34,

Part 6 is not enforceable as to any sex-based identity narrative, homosexual or otherwise, then

the Court will by implication be admitting that *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015),

*United States v. Windsor,* 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013) amount to intellectually

dishonest "junk law" along the same lines as *Lochner v. New York*, 198 U. S. 45, 76 (1905) and

*Dred Scott v. Sandford,* 60 U.S. 393 (1857), which were also invalid decisions made by Justices

then who were also punch drunk on the unexamined assumption of the superiority of their

cultural moment during their time.   Just as *Brown v. Board of Education of Topeka*, 347 U.S.

483 (1954) overturned *Plessy v. Ferguson*, 163 U.S. 537 (1896), this Court could use *Grace v.*

*Phillips* to overturn *Obergefell v. Hodge,* 192 L. Ed. 2d 609 (2015), whose decision the Chief

Justice labeled as "disheartening" perhaps for good reason. *Obergefell* at 3 (Roberts Dissenting).

The Court should not be concerned with who it offends - even if it offends the Plaintiffs and

causes them to not get all they want. The Court has to decide if upholding the rule of law and

fulfilling its Constitutional oath of office is priority or whether trying to engage in additional

judicial cover up is in the hopes that the public will not see through the Court's insurmountable

lack of integrity.  This Court may be required to demonstrate if it is a creature of culture or a

slave to the Constitution, just as the Defendants are operating under the authority of the God of

the Bible and the Lion of Judah.

41. The *Obergefell* Majority was absolutely right when it said that the United States Constitution

was not silent as to how all 50 states must legally define marriage, and the dissent was dead

wrong in their cop-out in suggesting that it should be left up to the individual states to decide.

*Obergefell* at 1 (Majority).  However, this Court has to resolve if the *Obergefell* court was dead

wrong in finding that the answer to how all 50 states must legally define marriage was answered

by the 14th Amendment, when it could have actually been answered most appropriately by the

1st Amendment Establishment Clause.  The question is whether the 1st Amendment is the

controlling Constitutional prescription that governs self-asserted sex-based identity narratives?

If the Court finds that the 1st Amendment bars the state and federal government from legally

recognizing sex-based self-asserted identity narratives in that C.R.S  24-34-601 et. seq is not

available to the Plaintiffs,  it will mean that all 50 states can only legally recognize marriage

between "one man and one woman" to include deep blue states despite the fact that some of

them might have voted in favor of legally recognizing gay marriage.   Justice Sotomayor, who

voted in favor of samesex marriage, was actually correct about one thing when she stated at oral

argument from the bench in *Obergefell v. Hodge*, 192 L . Ed. 2d 609 (2015) the following: " We

do not live in a pure Democracy. We live in a Constitutional Democracy." If the First

Amendment requires all 50 states to only legally recognized secular/neutral non-controversial

marriage between "one man and one woman," then the flagrant intellectual dishonesty and

judicial malpractice in *Obergefell v. Hodge*, 192 L . Ed. 2d 609 (2015) will have ultimately

accomplished the opposite result it set out to achieve. It will mean that all 50 states can only

recognize marriage between "one man and one woman" and statutes like C.R.S  24-34-601 et.

seq and transgender bathroom policies are instantaneously Constitutionally invalid in a single

instance. This is a paramount question presented in this Article III case and controversy which

the Court may be required to resolve?

### (d) Question Presented: If Self-Asserted Sex-Based Identity Narratives Are Governed By The First Amendment Establishment Clause Then It Should Be Determined If  Title 24, Article 34, Part 6 And Gay Marriage Policy Are Unconstitutional Under The First Amendment Establishment Clause For A Different Reason For The Unequal Treatment Of "Religion and Religion?"

42. There is a different question presented by the First Amendment Establishment Clause if it is

controlling over the 14th Amendment civil rights narrative: if self-asserted sex-based identity

narratives are found to be inherently "religious in nature" and therefore governed under the First

Amendment as some ex gays are testifying here, it then must be determined if homosexuality,

polygamy, machinism, zoophilia are different sect/denominations within the overall church of

western postmodern relativism and expressive individualism? (See DE_Pastor Cothran ¶¶ 1-50;;

DE _ Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶

1-21). If homosexuality is "religious in nature" and if the government provides special treatment

for those individuals who subscribe to the homosexual ideology, then very obviously the

Plaintiffs deserve the same treatment by the government, otherwise, the government will be

violating the First Amendment Establishment Clause for a different reason insofar as it is

discrimination against "religion and religion." *McCreary Cnty, Ky. v. ACLU of Ky.*, 545 U.S.

844, 860 (2005); *Engel v. Vitale*, 370 12 U.S. 421, 431 (1962). Just as the government could not

give special tax benefits to members of the Methodist Church, only to deny those same benefits

to members of the Lutheran Church, since both are in the same Christian Church, the

government clearly cannot give special benefits, privileges, and protections to individuals in the

homosexual sect/denomination only to then arbitrarily deny those same benefits to those in the

polygamy and machinism denomination, since both are under the umbrella of the church of

moral relativism, without the government flagrantly violating the First Amendment

Establishment Clause.  In fact, if this Court was to arbitrarily find that Title 24, Article 34, Part 6

only protected individuals who subscribe to the homosexual ideology but not to those who

believe in the plausibility of polygamists and machinists doctrine, the Plaintiffs would instantly

have standing (and they have such standing now) to sue the state of Colorado in District Court to

enjoin the state from even enforcing Title 24, Article 34, Part 6 under the First Amendment for

discrimination against "religion and religion" because at least that way different denominations within the church of western postmodern relativism and expressive individualism would actually be treated equally under the law and not with disproportional degrees of favoritism.

43.  For better or worse, the Plaintiffs want to be treated equally under the law as individuals who self-identify as homosexual at all cost, even if it means that neither they nor homosexuals beliefs on love, morality, sex, marriage, and rights are afforded legal recognition and ratification by the state and federal government whatsoever. The most important consideration for the Court to determine is whether the resurrection of Constitutional integrity is paramount to having prior courts become publicly humiliated for being rife with intellectual dishonesty and judicial malpractice that could be wrongfully proliferating persecution of Christians?  The Court in this action may have to simply do its job and not worry about trying to save face for prior courts already questionable reputations that were intentionally proliferating judicial malpractice and intellectual dishonesty due to their emotional problem with the same absolute truth that is the foundational basis for Article III courts existence to begin with. If a moral relativist Judge does not know the difference between actual right and wrong and real and fake, then they are categorically unfit to administer Justice in the United States to begin with.

### (e) Question Presented: Which Set Of Moral Doctrine As A Basis For Law Matters And Does Not Lead To Unconstitutional Policies And Regulations?

44. A question presented in this action is what moral doctrine as a basis for law must the Court and lawmakers exclusively rely on so that the policy decisions are not found to be Unconstituional and abusive? The Plaintiffs in this action are advocating for one set of moral doctrine and the Defendants another as the primary basis for law.  Both doctrines cannot be right. At some point, the United States state and Federal Government are going to come to terms with

the fact that "without faith," there is no basis for "morality," and "without morality" there is no

basis for "law." There is no way to get around that axiom.  To say that "moral doctrine" as a

basis for law "does not matter" is itself a "moral doctrine" that suggests that it alone "matters."

Such a position is floated by jaded moral relativists in the public square all the time, amounting

to an imperialistic power play as a way of coming out on top so that their narrow and exclusive

religious worldview serves as the paramount legal basis at the expense of acdtual Constitutional

integrity and actual fundamental rights that are already codified for cause.  The real question

remains which set of moral doctrine can be used used to fashion laws and policy without

violating the United States Constitution and the Honorable Court must determine if the answer is

this:

"Can the state and federal government only use morality that is predicated on self-evident truth

to craft laws and policy in order for them to be Constitutionally compliant?"

45.  The Plaintiffs are not necessarily asking that the Court find that "America is Christian

Nation" as the Supreme Court already found in *Church of the Holy Trinity v. United States*, 143

U.S. 457 (1892) and the Plaintiffs are not asking the Court to determine if "America is a Savage

Nation" as Justice Kennedy suggested when he enshrined the modern mindset by floating, "at the

heart of liberty is the right to define one's own concept of existence, of meaning, of the

universe." *Planned Planned Parenthood v. Casey,* 505 U.S. 833, 846-47 (1992).[8]  However, just

because the self-evident morality may or may not parallel the New Testament Gospel narrative

does not automatically mean that the self-evident truth is not neutral and that it is not secular in

---

[8] Of course, what Justice Kennedy was saying was "to each his own," which was, of course, what the sign entering Buchenwald concentration camp read, since it has been used as a principle predicated on the ends justifying the means to carry out atrocities for millennia.

nature. The Court might find that it is.  The Court might need to determine that just because

"man-woman" marriage is supported by the Bible does not mean that "man-woman" marriage is

"Christian marriage." The Court might have to determine if marriage between "one man and one

woman" is the only secular form of marriage and that all other forms of parody marriage are

religious in nature, requiring a huge amount of faith to even believe that they can exist.[9]  Very

obviously, man-woman marriage is not controversial but all other forms of marriage equally are

from a legal perspective but perhaps not a factual one. It should be determined if parody

marriages amount to a "critique of religion" and self-evident truth. After all, "critiques of

religion" are almost always a "new religion."[10]

---

[9] Traditional marriage arose out of the "the nature of things" and did not arise out of a desire to acquire political power and to use government as a tool to show the irresponsible gospel of moral relativism down the throats of our citizens. (Roberts dissent page 5). See G. Quale, A History of Marriage Systems 2 (1988); cf. M. Cicero, De Officiis 57 (W. Miller transl. 1913). Because moral relativists pretend or believe that marriage is an "esteemed institution." Obergefell at 13 (Majority Opinion). The lawmakers codified DOMA and the marriage bans from preventing irrational moral relativist from using government to codify their wack religious ideals by hijacking this "esteemed institution." *Goodridge*, 440 Mass., at 322, 798 N. E. 2d, at 955.Pg 12 Roberts in his dissent in *Obergefell* stated: "In his first American dictionary, Noah Webster defined marriage as "the legal union of a man and woman for life," which served the purposes of "preventing the promiscuous intercourse of the sexes, . . . promoting domestic felicity, and . . . securing the maintenance and education of children." 1 An American Dictionary of the English Language (1828). An influential 19th century treatise defined marriage as "a civil status, existing in one man and one woman legally united for life for those civil and social purposes which are based in the distinction of sex." J. Bishop, Commentaries on the Law of Marriage and Divorce 25 (1852). The first edition of Black's Law Dictionary defined marriage as "the civil status of one man and one woman united in law for life." Black's Law Dictionary 756 (1891) (emphasis deleted). The dictionary maintained essentially that same definition for the next century. This Court's precedents have repeatedly described marriage in ways that are consistent only with its traditional meaning. Early cases on the subject referred to marriage as "the union for life of one man and one woman," *Murphy* v. *Ramsey*, 114 U. S. 15, 45 (1885), which forms "the foundation of the family and of society, without which there would be neither civilization nor progress," *Maynard* v. *Hill*, 125 U. S. 190, 211 (1888). We later described marriage as "fundamental to our very existence and survival," an understanding that necessarily implies a procreative component. *Loving* v. *Virginia*, 388 U. S. 1, 12 (1967); see *Skinner* v. *Oklahoma ex rel. Williamson*, 316 U. S. 535, 541 (1942). *Jones* v. *Hallahan*, 501 S.W.2d 588, 589 (Ky. 1973)(the secular dictionary definition of marriage is one man and one woman).

[10] Consider the military, where there is no time to pretend that absolute morality as a basis of law does not exist. The Uniform Code of Military Justice (UCMJ) 809.ART.90 (20), makes it clear that military personnel need to obey the "lawful command of his superior officer," 891.ART.91 (2), the "lawful order of a warrant officer", 892.ART.92 (1) the "lawful general order", 892.ART.92 (2) "lawful order." In each case, military personnel have an obligation and a duty to only obey lawful orders and indeed have an obligation to disobey unlawful orders, including orders by the president that do not comply with the UCMJ. *Armbruster v. Cavanaugh*, 140 Fed. Appx. 564 (3rd Cir. 2011). The moral and legal obligation is to the U.S. Constitution and not to those who would issue unlawful orders, especially if

### (f)  Who Is Really Guilty Of Bigoted Racial Animus?

46. Another question presented in this action is who is really guilty of bigoted racial animus - the

Christian Defendants or the moral relativist Plaintiffs? Are the Plaintiffs bigoted or are the

Defendants?  It cannot be both. In his letters from a Birmingham jail, Dr. Martin Luther King Jr.

explained that the way that he knew that a law unjust was if it conflicted with a "higher law" or

"divine law." Reverend King knew that segregation laws were unjust because they rubbed with

legal concepts in the Bible which he believed contained a high law as a matter of faith. The same

legal basis upon which the civil rights movement succeeded is the exact same legal basis that the

Defendants are operating under - the Bible.  Since this is a discrimination action, it should be

determined if the Defendants and Dr. King are guilty of racial-type animus for believe that the

Bible is a source of higher law, or whether moral relativist are guilty of racial animus in kind for

misappropriating the race-based civil rights movement in an effort to shoehorn their beliefs into a

legal reality based on the idea that the ends justify the means in step with Saul Alinsky's rules for

radicals and a series of calculative emotional appeals that consists of red herrings and

misdirections?

47.  Moreover, if the Court were to find that the First Amendment Establishment Clause

informed the government whether it could legally recognize self-asserted sex-based identity

narratives, not the 14th amendment, then the Court must find that anyone who attempted to

shoehorn these matters into the 14th amendment narrative as if sexual orientation was actually

---

those orders are in direct violation of the Constitution and the UCMJ. The paramount question is "upon what set of
morality can a junior officer classify a law as immoral in order to validly disobey an order?" And if "morality" is the
valid basis decision for a junior officer to disobey an order, clearly this same "morality" must itself serve as a
compelling and proper basis for the legislature, executive, and courts to fashion law and policy in the area of sex and
marriage policy. Morality as a basis for law absolutely matters for a justice to pretend otherwise renders them unfit
for office. Judges must know the difference between right and wrong and real and fake in order to serve.

equal to the legal basis for the race-based civil rights was guilty of fraud and intellectual dishonesty in a manner that manages to be both racially and sexually exploitative. For anyone to say that "sexual orientation rights are equal to race based rights" and not really mean it because they are merely trying to justify a lifestyle and value system that for centuries has been legally classified as obscene, dehumanizing, and often times illegal would very obviously constitute a form of racial discrimination in kind that is radically exploitative and dishonest. This Court may be required to decide is such a premise is true or not.

48. Plaintiff Grace is a former transgender African American, who now self-identifies as a polygamist. If it is false to suggest that "sexual orientation rights" are "equal to race-based civil rights," then very obviously state of Colorado, not the Defendants, is discriminating against Plaintiff Grace for even having a statute like Title 24, Article 34, Part 6 that put "sexual orientation" along side of "race," while knowing that race is based on immutability but sexual orientation is not. (See DE_Pastor Cothran ¶¶ 1-50;; DE _ Quinlan ¶¶ 1-37, DE _Dr. King ¶¶ 1-20;; DE 22 Goodspeed ¶¶ 1-20; DE _Dr. Cretella ¶¶ 1-21).. There is no doubt that for the state to say that "sexual orientation rights are equal to race rights" and "not really mean it" is an act of hardcore racial animus that is racially exploitative and Constitutionally outrageous to the point that those who are advancing that false narrative should be held accountable as a matter of actual justice. The Court should resolve who are the real bigots here for the public record, since the Windsor Court attempted to do so and might have been mistaken? *United States v. Windsor*, 133 S. Ct. 2675, 186 L. Ed. 2d 808 (2013).

**(g) Two Questions Not Presented**

49. There are two questions that are not presented by this action that the Court must not address that are worth pointing out so that this Court does not abuse its discretion if the Defendants prompt it to do so based on an attempt to avoid this case and controversy due to a refusal to think.  First, the Plaintiffs are not interested in the Court's nor the Defendants arbitrary opinion and feeling as to whether an adults subscription to homosexual, polygamy, zoophilia, and machinism ideology and lifestyle is prudent, plausible, and wise.  Adults should be allowed to formulate their own opinions on sex, morality, and marriage without a government official telling them what "is or is not ok to believe," unless of course perhaps the person is a Christian and then the government may need to tell them what to think and believe by stretching the 14th amendment through a series of emotional appeals as Justices Kennedy and Ginsburg thinks is appropriate.  Furthermore, it is not a question at issue whether homosexuality, polygamy, machinism, and zoophilia should be illegal. *Lawrence v. Texas*, 539 U.S. 558 (2003) overturned *Bowers v. Hardwick*, 478 U. S. 186 (1986) settling the matter, establishing that sodomy should not be illegal between two consenting adults of the same-sex.  The question here is simply whether the government can legally recognize self-asserted sex-based identity narratives under Title 24, Article 34, Part 6  or, alternatively, whether Title 24, Article 34, Part 6 is patently unconstitutional under the coercion test and lemon test pursuant to the First Amendment Establishment Clause? These are questions raised by the case that the Court and public may need to resolve that the Plaintiffs feel compelled to point out so that they can be better answered by this Court for the benefit of the public's health, safety, and welfare and for the sake of our Constitutional Republic, and for the sake of the public perception of the state and federal courts themselves regarding trustworthiness.

## CAUSE OF ACTION TITLE 24, ARTICLE 34, PART 6

50.  The Plaintiff repeats and incorporates by reference all of the above allegations of this

Complaint as though fully set forth herein.

51.  C.R.S  24-34-601(2)(a) states:

It is a discriminatory practice and unlawful for a person, directly or indirectly, to refuse, withhold from, or deny to an individual or a group, because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry, the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation or, directly or indirectly, to publish, circulate, issue, display, post, or mail any written, electronic, or printed communication, notice, or advertisement that indicates that the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of a place of public accommodation will be refused, withheld from, or denied an individual or that an individual's patronage or presence at a place of public accommodation is unwelcome, objectionable, unacceptable, or undesirable because of disability, race, creed, color, sex, sexual orientation, marital status, national origin, or ancestry.

52.  The Plaintiff self-identify as machinists and polygamists, as their self-asserted sexual

orientation. The Defendants refused to provide the Plaintiffs with different service in separate

transactions over 150 times strictly because of their sexual orientation.

53.  The Plaintiffs suffered financial and emotional damages as a result of the discrimination

under Title 24, Article 34, Part 6 having had their sexual orientation held against them.

WHEREFORE,

(1) The Plaintiffs demand that the Defendants pay damages in the amount of $75,000. Because

the Defendants were recently found guilty of violating Title 24, Article 34, Part 6 and  C.R.S

24-34-601 et. seq. as applied to homosexuals only to then refuse service to the Plaintiffs on the

same basis, the Plaintiffs ask for the maximum damages allowed to include punitive damages.

(2) The Plaintiffs demand that the Court require the Defendants to treat and serve the Plaintiffs just as they are required to treat and serve homosexuals under the law, issuing a permanent and preliminary injunction to that effect.

(3) The Plaintiffs request the case caption of this act be entitled *"Grace v. Masterpiece Cakeshop Ltd.,"* not *Grace Harley v. Masterpiece Cakeshop ltd.*

(4) The Plaintiffs seek a declaration as to whether the Defendants violated Title 24, Article 34, Part 6 and discriminated against the Plaintiffs.

(5) Any other equitable relief that this court beliefs is fair and just.

(6) The Plaintiffs want a declaration whether Title 24, Article 34, Part 6 violates the lemon test and coercion test of the First Amendment Establishment Clause or whether it is constitutional under the 14th Amendment equal protection and substantive due process.

/s/Chris Sevier/
9 Music Square South
Nashville, TN 37203
BPR#026577
ghostwarsmusic@gmail.com
(615) 500 4411
Ghost OP SF Romeo Juliet

/s/Joan Grace Harley/
9 Music Square South
Nashville, TN 37203
gracelaw7@gmail.com

/s/John Gunter Jr./
9 Music Square South
Nashville, TN 37203
BPR#026577
(801) 654 5973
johnjr@tel-electronics.com

John Gunter, Founder of Clean Services Foundation

/s/Whitney Kohl/
9 Music Square South
Nashville, TN 37203

Whitney Kohl

rougeattorneyatlaw@gmail.com

*Exhibit*

Q (/search)    🖨 (/print/1172481)    f (http://www.facebook.com/cnsnewscom?ref=ts)    🐦 (http://twitter.com/#!/cnsnews)    🔊 (/feeds/all)

**DONATE**    (/join-movement)



THE RIGHT NEWS RIGHT NOW

## Blog

(/opinion/Blog)

# Johns Hopkins Psychiatrist: 'There Is No Gay Gene'

 (/author/michael-w-chapman) By Michael W. Chapman (/author/michael-w-chapman) |
July 21, 2016 | 12:11 PM EDT

Dr. Paul R. McHugh, the Distinguished Service
Professor of Psychiatry at Johns Hopkins
University



**Dr. Paul R. McHugh.**

**(Johns Hopkins University)**

(http://www.hopkinsmedicine.org/profiles/results/directory/profile/0003340/paul-
mchugh)and former psychiatrist–in–chief for Johns Hopkins Hospital, who has
studied sexuality for 40 years, said it is a scientific fact that "there is no gay gene."

"Environment," however, "is very important," said Dr. McHugh, author of *The Mind
Has Mountains: Reflections on Society and Psychiatry*
(https://www.amazon.com/Mind-Has-Mountains-Reflections-
Psychiatry/dp/0801882494). He also explained that the permissive sexual culture in
the United States today has confused "desire" with "love," and that homosexuality is a
false or "erroneous desire."

In an interview with *Virtue Online: The Voice for Global Orthodox Anglicanism*
(http://www.virtueonline.org/charleston-sc-dr-paul-mchugh-there-no-gay-gene),
reporter Lydia Evans asked Dr. McHugh, "How do you view the popular assumption
that science has somehow proven that sexual orientation is determined early in
childhood, if not before birth?"

Dr. McHugh, who ended the sexual reassignment surgery program at Johns Hopkins
because it was not helping the patients, answered, "Well, as I have said, there is no gay
gene. And there are factors more influential than biology."

"The best data, of course, [comes from the Framingham Study]," said Dr. McHugh. "If
you are a man and you grow up in a rural environment, you are four times less likely to
have homosexual relationships than if you grow up in a metropolitan area. That's not
left-handedness."

Johns Hopkins Psychiatrist: "There Is No Gay Gene"

"If you are a lesbian, you are much more likely to be college-educated," he said. "That's not something that happens at conception."

"My point is that we now know that the environment is very important," said Dr. McHugh.

Lydia Evans then asked, "On another front, as the sexuality debate within mainline churches seems to have shifted so profoundly in favor of the left, how do you see the debates of the broader culture changing in the next five to ten years?"

Dr. McHugh said, "It really is amazing -- I mean, 50 years ago [homosexual behavior] was a crime, and now we're talking about [same-sex marriage]. Anyone who wants to stick with the tradition is accused of being a biblical literalist or a homophobic racist, because, in part, of the more fundamental change in our society towards permissiveness, that is, easy divorce, cohabitation and concubinage, abortion, pornography ... and euthanasia."



(AP)

"The issue of the homosexual is not separate," he said. "It's all part and parcel of the pandemonium that the permissive movement has brought. We have just licensed all kinds of behavior."

When asked about earlier generations being pressured to marry and have families, Dr. McHugh said these were societal expectations and they were positive.

"Yes, and they were good ones," he said, "and biblically based, and part and parcel of my commitment to really what amounts to loving relationships."

"You see, what has happened with the permissive movement is that it has picked up the Freudian confusion of desire and love, making them the same," said Dr. McHugh. "And with the implication, for example, that I must desire my mother. I don't desire my mother. I love my mother."

He continued, "Now the fact is that in my marriage, of course, I desired this woman and I felt love for her. Now, 50 years into marriage with her, I still desire her, but now I love her. She's irreplaceable. There is this thing that has come and it's different. This person exists for me as irreplaceable. So, there is this confusion of desire and love. [Homosexuality] is erroneous desire."

When Lydia Evans asked (http://www.virtueonline.org/charleston-sc-dr-paul-mchugh-there-no-gay-gene)about how the environment of a church, or religious-minded community, could affect people's behavior, Dr. McHugh said, "This is the point. You've got to get the churches -- not just the Anglican churches, but the Roman Catholics and the Presbyterians."



(AP)

"They've got to start talking again about their foundational opinions," he said. "There's an idea of there being different kinds of laws in our world: the natural law, the law of desire -- but there is scriptural law that comes out of the Old Testament. And they've got to get all of this straight."

Paul McHugh, MD, is University Distinguished Service Professor of Psychiatry at Johns Hopkins Medical School and the former psychiatrist-in-chief at Johns Hopkins Hospital. He also served on the Presidential Council on Bioethics.

The interview with Dr. McHugh first appeared in *Virtue Online: The Voice for Global Orthodox Anglicanism* (http://www.virtueonline.org/charleston-sc-dr-paul-mchugh-there-no-gay-gene).

---



(/author/michael-w-chapman)

## Michael W. Chapman
🐦 Follow (http://www.twitter.com/ChapmanCNSNews)

Bio (http://www.cnsnews.com/author/michael-w-chapman) | Archive (http://www.cnsnews.com/author/michael-w-chapman)

Michael W. Chapman

More from Michael W. Chapman (http://www.cnsnews.com/author/michael-w-chapman)

---

Printer-friendly version (/print/blog/michael-w-chapman/johns-hopkins-psychiatrist-there-no-gay-gene)

tv-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
v-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)
v-cns&utm_medium=referral&utm_content=thumbnails-a:Below Article Thumbnails:)

**You May Like**

(http://activatedyou.com/cmd.php?ad=834809&utm_source=taboola&utm_medium=referral)

### Hollywood Actress Tells All: "I Hope My Story Will Help Other Women"
**ActivatedYou**

(http://activatedyou.com/cmd.php?ad=834809&utm_source=taboola&utm_medium=referral)
(http://click.clktraker.com/aff_ad?campaign_id=343&aff_id=1082&hostNameId=2951&utm_source=cpc&aff_sub2=mrctv-cns&aff_sub3=How+Car+Dealers+Get+Rid+of+Unsold+Inventory&aff_sub4=http%3A%2F%2Fcdn.taboolasyndication.com%2Flibtrc%2Fsta

### How Car Dealers Get Rid of Unsold Inventory
**Auto Deals Ace - Sponsored Ads**

(http://click.clktraker.com/aff_ad?campaign_id=343&aff_id=1082&hostNameId=2951&utm_source=cpc&aff_sub2=mrctv-cns&aff_sub3=How+Car+Dealers+Get+Rid+of+Unsold+Inventory&aff_sub4=http%3A%2F%2Fcdn.taboolasyndication.com%2Flibtrc%2Fsta
(http://thedesigninspiration.com/news/facts/20-incredible-gardening-tricks-that-will-make-your-neighbors-jealous/?utm_source=taboola&utm_campaign=11Basta1&utm_medium=referral&utm_content=20+Brilliant+Tricks+That+Every+Gardener+Should+Kno
1408100234248381370.png&utm_term=mrctv-cns)

### 20 Brilliant Tricks That Every Gardener Should Know About
**The Design Inspiration**

(http://thedesigninspiration.com/news/facts/20-incredible-gardening-tricks-that-will-make-your-neighbors-jealous/?utm_source=taboola&utm_campaign=11Basta1&utm_medium=referral&utm_content=20+Brilliant+Tricks+That+Every+Gardener+Should+Kno
1408100234248381370.png&utm_term=mrctv-cns)
(http://nucific.com/cmd.php?ad=742578&utm_source=taboola&utm_medium=referral)

### 3 Foods To Avoid in 2017
**BIO X4 Supplement**

(http://nucific.com/cmd.php?ad=742578&utm_source=taboola&utm_medium=referral)
(https://plarium.com/play/en/soldiers/top_g?publisherID=mrctv-cns&plid=90163&pxl=taboola_fr)

### If you own a computer you must try this game
**Soldiers: Free Online Game**

(https://plarium.com/play/en/soldiers/top_g?publisherID=mrctv-cns&plid=90163&pxl=taboola_fr)

CULTURE    *Exhibit*

# Man's Lawsuit BRILLIANTLY Challenges Gay Marriage... Liberals Are Stomping Mad

## BY **DAVIS**

ON APRIL 21, 2016 AT 2:08PM

Advertisement - story continues below

 Back     Share      Next

Ever since the Supreme Court ruled that gay marriage was a right protected under the Constitution, there have been a number of lawsuits and attempts to push back this ruling.

The Houston Chronicle reported that Chris Sevier, a Tennessee lawyer, has sued the Harris County District Clerk, Texas Gov. Greg Abbott and Texas Attorney General Ken Paxton in federal court in Houston, claiming that his right to marry has been violated.

Sevier wasn't trying to marry another person, however. He was attempting to marry is laptop, and has argued that the 14th Amendment is "proof" that he should be allowed to do so.

Advertisement - story continues below

Sevier has attempted to counter the Supreme Court's ruling that the 14th Amendment extends to same-sex couples by saying that if it extends to them, it should extend to other bizarre applications just as well.

ey General Ken Paxton has tried to get the lawsuit thrown out, stating
o basis in reality.

 marry one's computer is not an interest, objectively, deeply rooted in
 history and tradition such that it qualifies as a protected interest,"
ef explained.

Advertisement - story continues below

ex marriage is? That's going to be a hard argument to follow.

6 25 2017

Man's Lawsuit BRILLIANTLY Challenges Gay Marriage   Liberals Are Stomping Mad

Sevier has insisted that his lawsuit wasn't some sort of joke or a waste of time. Rather, Sevier said that he believed the Constitution was being "hijacked" and he was trying to stand up for it.

Sevier's ultimate goal is to get two federal appeals courts judges to disagree, which would allow his lawsuit to go on to the Supreme Court — which could have some very interesting side effects.

Sevier certainly has taken an unusual route in his challenge to the Supreme Court's ruling. By pointing out that extending 14th Amendment protections to a group of people that some consider shouldn't have those protections you could theoretically extend them to inanimate objects, Sevier has drawn attention to a big flaw in the Supreme Court's reasoning on same-sex marriage.

Advertisement - story continues below

While Sevier may be joking about his lawsuit, we all know that eventually someday someone will actually seriously want to marry their computer, or something equally as ridiculous. It's only a matter of time.

What do you think of this lawsuit? Scroll down to comment below!

Suggest a correction

**POPULAR RIGHT NOW**

Barron Trump Destroys Internet With Picture of Marine Standing by Aircraft

WWE Humor Video Shows Trump And Vince Going at It

Marco Rubio Praises Trump When Asked What It's Like to Work With Him

Tags. same-sex marriage, Supreme Court
By  Davis on April 21  2016 at 2 08pm

http  conservatvetribune com mans-lawsuit-no-marriage

Exhibit



PHOTO ILLUSTRATION BY SARAH ROGERS/THE DAILY BEAST

MAN AND MACHINE

## Meet the Anti-LGBT Bigot 'Marrying' His Computer

Meet Mark Sevier, a Christian music producer with a lengthy arrest record and a history of bogus lawsuits.

 SAMANTHA ALLEN 04.21.16 1:00 AM ET

   



PHOTO ILLUSTRATION BY SARAH ROGERS/THE DAILY BEAST

It's a love story as old as time itself. Man meets laptop. Man fills laptop with pornography. Man sues state for the right to marry his masturbatory aid.

In 2014, former Tennessee lawyer and Christian electronic dance music producer Mark "Chris" Sevier filed a motion in Florida arguing that if same-sex couples "have the right to marry their object of sexual desire… then I should have the right to marry my preferred sexual object," in this case his "porn-filled Apple computer."



ADVERTISEMENT

The motion was dismissed, of course, but Sevier is back again with a new Texas lawsuit demanding that he be granted a 14th Amendment right to wed his laptop.

As the Houston Chronicle reports, Texas Attorney General Ken Paxton has already asked for the lawsuit to be dismissed, arguing that "the right to marry one's computer is not an interest, objectively, deeply rooted in the nation's history and tradition."

At the very least, Sevier appears to be monogamous. The laptop named in this new suit is the same 2011 MacBook that he asked to marry in 2014.

But Sevier, who has said that "the Constitution is being hijacked" by same-sex marriage, does not seem to actually be in love with his computer. The EDM artist has a long history of bogus legal actions designed to undermine marriage equality.

He also has a lengthy arrest record, including a 2013 aggravated stalking charge for—among other things—allegedly sending what the Associated Press could only describe as "a half-naked picture of himself draped in an American flag and covered in a

6/25/2017                                              Meet the Anti-LGBT Bigot 'Marrying' His Computer

substance that represented blood" to country music singer John Rich.

Sevier wasn't always so enamored with his laptop. In 2013, he sued Apple in federal court claiming to be "a victim of Apple's product that was sold to him without any warning of the damage that pornography causes."

In the "Facts" section of that suit's 50-page complaint, Sevier tells the tale of his star-crossed meeting with his aluminum bride-to-be. They found each other at an Apple Store in Tennessee, where Sevier purchased the laptop so that he could "create music" for his musical group "Ghost WARS" and also so that he could "log onto the Internet."

All was well for a brief honeymoon period but then, one day, Sevier "accidentally misspelled 'facebook.com' which lead him to 'fuckbook.com' and a host of websites that caused him to see pornographic images that appealed to his biological sensibilities as a male."

Sevier claimed that he "had never seen pornographic images" prior to purchasing the computer and that he quickly developed "an unwanted addiction with adverse consequences."

To be clear, porn addiction is not a legitimate psychological diagnosis but Sevier claims nonetheless that his "addiction" made him "prefer the cyber beauties over his wife, which caused his marriage to fail." All of this he blamed on Apple for not including a "safe mode" on the computer that would protect him from the dangers of pornography.

Get The Beast In Your Inbox!

Enter your email addr

### Daily Digest

Start and finish your day with the top stories from The Daily Beast.

### Cheat Sheet

A speedy, smart summary of all the news you need to know (and nothing you don't).

By clicking "Subscribe," you agree to have read the Terms of Use and Privacy Policy.

SUBSCRIBE

Thank you! You are now subscribed to the Daily Digest and Cheat Sheet. We will not share your email with anyone for any reason.
It didn't take long, apparently, for Sevier to accept a lifelong future with his mechanical companion. In May 2014, he filed a lawsuit in Utah claiming that a county clerk had denied his request for a marriage license, noting that "one man and one machine" did not a marriage make.

Sevier didn't take "no" for an answer, arguing in his suit: "Those of us whose sexual orientation has been classically conditioned upon orgasm through the straightforward science of dopamine to prefer sex with inanimate objects and animals do not have public support, like the gays, so we are especially vulnerable here."

But the full Utah motion (PDF) does not make it seem like Sevier actually wants his relationship with his Mac to be legally recognized. He speculated that, if the court ruled in his favor, then "we will progress into a Nation that gives equal protection to all classes of sexual orientation allowing everyone to marrying anyone and anything to suit their appetite in the name of 'tolerance,' 'equality,' and 'love'—becoming slaves of our glands, not slaves of virtue."

His rapidly dismissed Florida motion was filed around the same time.

If Sevier's MacBook were capable of feeling human emotion, it would likely be heartbroken to learn that it is being used a political pawn.

In an email interview with The Daily Beast, however, Sevier insisted that he would indeed go through with marrying his laptop if a court ruled in his favor. Asked what kind of wedding he would hold, he replied, "Your question is not substantive to the legal proceeding at hand and is reductionistic and irrelevant to these matters.

"The case is not a ploy to undermine same-sex marriage rights," he claimed. "It is a demand that the courts restore Constitutional integrity."

Sevier was more direct with the Houston Press, which asked if he was comfortable with the possible but improbable outcome

6/25/2017                                    Meet the Anti-LGBT Bigot 'Marrying' His Computer

of "destroy[ing] marriages and families across the country" by undermining *Obergefell v. Hodges*. Sevier reportedly "said yes."

"The state is not doing anyone any favors by encouraging people to live that lifestyle," he told the *Press*. "We have to define marriage."

If Sevier is seeking a definition of marriage, he should avoid consulting the MacBook dictionary, which notes that marriage is a "formally recognized union of a man and a woman" or of "two people of the same sex" depending on the jurisdiction.

## Sponsored Stories

Recommended by



**Why Is Everyone Trying Walmart's Grocery Pickup Service? Order Online & Pickup for Free!**

WALMART



**Type II Diabetes: The Most Common Signs & Symptoms**

ACTIVEBEAT

**With A $12 Membership Fee For The First Year With Auto-Renew, Now Is The Time To Join AARP**

AARP



**Mark Cuban Predicts This Will Make Someone a Trillion Dollars**

THE MOTLEY FOOL

Politics   Entertainment   World News   Drink and Food   Arts and Culture   U.S. News   Tech

About  Advertise  Contact  Jobs  Help  Privacy  Code of Ethics & Standards  Terms & Conditions  Copyright & Patent  Sitemap

*Exhibit*

# Citing LGBT discrimination, California bans state travel to Kentucky and three other states

**USA TODAY NETWORK**   Thomas Novelly, The (Louisville) Courier-Journal   Published 3:14 p.m. ET June 23, 2017 | Updated 12:30 a.m. ET June 24, 2017



*(Photo: Pat McDonogh, The (Louisville) Courier-Journal)*

LOUISVILLE — California's attorney general blocked state-funded travel to Kentucky (http://cjky.it/2rL4PzP) and three other states on Thursday in response to what he considers anti-LGBT rights laws enacted this year.

Chris Hartman, the director of Louisville's Fairness Campaign, said that the bill the California AG is retaliating against, Senate Bill 17, could have indirect repercussions on the LGBT community in one of the nation's more gay-friendly cities.

"This is a clear example of the unforeseen consequences that even a vaguely anti-LGBT bill can have," Hartman said. "This is a bill that we opposed, and here we have a real-world economic consequence of passing this bill."

The worry is that SB 17, which goes into effect this summer, could lead to scenarios where LGBTQ students are prevented from joining a Christian club led by students who disagree with homosexuality.

SB 17 was sponsored by Sen. Albert Robinson, R-London. Robinson said it affirms students' constitutional right to express religious and political views in public schools. He said school officials previously have violated students' rights to express themselves for fear of being sued, but this legislation makes it clear that those discussions are OK.

Louisville has been widely accepted as an LGBT-friendly city. In 2015, Louisville ranked 11th in the country for gay residents, and the University of Louisville was named one of the most LGBTQ-friendly campuses in the South by Campus Pride Index.

In 2015, Hartman said gays have flocked to Louisville since 1999, when it became one of the first cities in the South to have a comprehensive law barring discrimination in housing and employment based on sexual orientation.

"This is a place where people feel comfortable being themselves," he said.

Amanda Stamper, spokeswoman for Gov. Matt Bevin's office, did not immediately return a request for comment.

California's Democratic Attorney General Xavier Becerra added Texas, Alabama, South Dakota and Kentucky to the list of places where state employee travel is restricted. Lawmakers passed legislation last year banning non-essential travel to states with laws that discriminate against lesbian, gay, bisexual and transgender people. North Carolina, Kansas, Mississippi and Tennessee are already on the list.

*Related*

Mississippi's controversial religious objection bill passed, igniting protests nationwide (https://www.usatoday.com/story/news/nation-now/2017/06/22/mississippis-controversial-religious-objection-bill-passed-igniting-protests-nationwide/420657001/)

'Born this way'? It's way more complicated than that (https://www.usatoday.com/story/news/2017/06/16/born-way-many-lgbt-community-its-way-more-complex/395035001/)

LGBTQ definitions every good ally should know (https://www.usatoday.com/story/news/2017/06/15/lgbtq-glossary-slang-ally-learn-language/101200092/)

California taxpayers' money "will not be used to let people travel to states who chose to discriminate," Becerra said.

It's unclear what practical effect California's travel ban will have. The state law contains exemptions for some trips, such as travel needed to enforce California law and to honor contracts made before 2017. Travel to conferences or out-of-state training are examples of trips that could be blocked. Becerra's office couldn't provide information about how often state employees have visited the newly banned states.

"California may be able to stop their state employees, but they can't stop all the businesses that are fleeing over taxation and regulation and relocating to Texas," said John Wittman, a spokesman for Texas Gov. Greg Abbott, a Republican.

*The Associated Press contributed to this report. Follow Thomas Novelly on Twitter: @TomNovelly (https://twitter.com/TomNovelly)*

Read or Share this story: https://usat.ly/2t3BBQX

7/8/2017                    Lesbian Woman Creates 'LGBT Bible App' to Promote 'Inclusivity' Within the Church I Christian News Network

ABOUT CHRISTIAN NEWS (HTTP://CHRISTIANNEWS.NET/ABOUT/)

CONTACT US (HTTP://CHRISTIANNEWS.NET/CONTACT-US/)

ADVERTISE (HTTP://CHRISTIANNEWS.NET/ADVERTISE/)

SUBMIT NEWS TIP (HTTP://CHRISTIANNEWS.NET/SUBMIT-NEWS-TIP/)

CHRISTIAN LISTINGS (HTTP://CHRISTIANLISTINGS.COM)

STORE (HTTP://CHRISTIANNEWS.NET/STORE/) 🛒

Search the News 🔍

Exhibit

# CHRISTIAN❂NEWS

CHRISTIAN NEWS NETWORK    CHRISTIANNEWS.NET

## (http://christiannews.net/)

# Lesbian Woman Creates 'LGBT Bible App' to Promote 'Inclusivity' Within the Church

(/#facebook)

*By Garrett Haley (http://christiannews.net/author/garrett-haley/) on June 26, 2017 · 37 Comments (http://christiannews.net/2017/06/26/lesbian-woman-creates-lgbt-bible-app-to-promote-inclusivity-within-the-church/#disqus_thread)*

(/#twitter)

(/#email)

Home >



**Photo Credit: YouTube**

**PHILADELPHIA** – A lesbian woman who is frustrated by the lack of homosexual-friendly material available in Christian bookstores has created what she describes as "the first LGBT Bible app," featuring resources that celebrate homosexuality and do not condemn same-sex sexual behavior as being sinful.

"This app is for people who identify as 'spiritual but not religious,' progressive Christians who have had premarital sex and don't care, who are frustrated with purity culture, who are pro-choice, pro-women, and who want to accept and embrace interfaith connections," Crystal Cheatham told AutoStraddle.com.

Cheatham, who hails from Philadelphia, describes herself as a lesbian Christian. Although she once thought that her same-sex attraction was incompatible with her belief in God, she has since decided to embrace and celebrate her lesbianism.

ADVERTISING

"I'm black, I'm a lesbian, and I'm tired of feeling like my faith doesn't matter," Cheatham said in a press release. "Some think it's an anomaly that a black lesbian can be a Christian, but there are many out there like me."

After coming out as a lesbian, Cheatham said she became frustrated by the lack of books and resources available in bookstores for people like her who identify as lesbian Christians. Therefore, she decided to address that by creating a pro-homosexual app called "Our Bible App."

"Our Bible App is the first LGBT bible app," the app's website states. "Creating devotionals for progressive Christians, we uplift believers of ALL stripes."

"Our Bible App supports the belief that spirituality is a spectrum and that faith is a journey," it outlines. "At its core, the holy text was written to be inclusive of all of God's creation especially those on the margins."

**Connect (http://www.facebook.com/christiannews.net) with Christian News**

Like 1.1    Share

Scheduled for release this Friday, Our Bible App will feature a library of progressive devotionals and a collection of Bible versions that refer to God in gender-neutral terms.

"Through devotionals highlighting pro-LGBT, pro-women and encourage interfaith inclusivity, we hope to provide a tool that is needed to create healthy prayer and meditation habits," the app website's claims.

Cheatham says that she hopes her app will help Christians embrace and accept homosexuality.

"There are so many Christians out there that want to be accepting of LGBT people, but don't know how because they haven't received the resources," she told PBS NewsHour.

However, Ken Ham, president of the apologetics ministry Answers in Genesis, says the Our Bible App is "biblically wrong" and misses the point of the gospel.

"[The creators of this app] are ignoring the very heart of the message of Christianity, that we become born again (John 3:3)—become new creatures—and gain a brand-new identity when we turn to Christ (2 Corinthians 5:17)!" Ham wrote in a blog post (https://answersingenesis.org/blogs/ken-ham/2017/06/19/new-bible-app-lgbtq-christians-who-feel-excluded/) on Monday.

"These professing believers are trying to find their identity in their sexuality and gender rather than submitting totally to Jesus Christ," Ham continued. "But we are no longer defined by our sin when we are Christians. We are defined by Christ who lives in us."

"There should be no such thing as an LGBTQ Christian any more than there should be a drunkard Christian, liar Christian, or adulterer Christian," he added. "We are simply Christians, and our identity is not in the sinful desires that we all still have (though Christians are given strength to restrain ourselves [1 Corinthians 10:13]), but in the One who died for our sin and gave us new life (1 Corinthians 6:9–20)."



Our Bible App Indiegogo

## A special message from the publisher...



**(http://www.biblesforiraq.org)**
Dear Reader, because of your generous support, we have
received enough funds to send many audio Bibles to Iraqi
and Syrian refugees displaced by ISIS in the Middle East.
Many have been distributed and received with gladness.
While we provide for the physical needs of the people, we
seek to provide the eternal hope only found in Jesus Christ
through the word of God. *Would you join us by making a
donation today to this important work?* **Please click here to
send an audio Bible to a refugee family >>**
(http://www.biblesforiraq.org)

dium=referral&utm_content=thumbs-2r:Below Article Thumbnails:)
dium=referral&utm_content=thumbs-2r:Below Article Thumbnails:)
dium=referral&utm_content=thumbs-2r:Below Article Thumbnails:)
You May Like

(https://bestcompany.com/medical-alert-systems/??

sp=tabo&cald=MedAlertsT_C&crid=41059592&pld=christiannews&dt=Desktop&gclid=2017-
07-

08+22%3A05%3A15&utm_source=Taboola&utm_medium=DADS&utm_campaign=MedAlerts1

**Best & Worst Medical Alert Systems.**

BestCompany.com

(https://bestcompany.com/medical-alert-systems/??

sp=tabo&cald=MedAlertsT_C&crid=41059592&pld=christiannews&dt=Desktop&gclid=2017-
07-

08+22%3A05%3A15&utm_source=Taboola&utm_medium=DADS&utm_campaign=MedAlerts1
(http://l.gelstm.com/l/5924993fcecd277cdf112f92?

bcid=5924a955cecd277cdf112fa6&bhid=5924aaa1cecd277cdf112fb0&utm_campaign=TB_D_

**The Secret of the South Beach Diet**

Topdust for South Beach Diet