FILED
U.S. DISTRICT COURT
DISTRICT OF COLORADO

**IN THE UNITED STATES DISTRICT COURT DISTRICT OF COLORADO**

2017 OCT -5  AM 10: 39

JEFFREY P. COLWELL
CLERK

BY_____DEP. CLK

| | | |
|---|---|---|
| **JOAN GRACE HARLEY, CHRIS SEVIER, JOHN GUNTER JR, WHITNEY KOHL,** *Plaintiffs* **V.** **MASTERPIECE CAKE SHOP LTD., JACK PHILLIPS** *Defendants* | | **Case No: 17-cv-1666** **Judge Martinez** **Magistrate Judge Wang** |

## BRIEF AMICUS CURIAE OF THE CENTER FOR GARDEN STATE FAMILIES IN SUPPORT OF THE PLAINTIFFS' CAUSES OF ACTION AND MOTIONS

Anna C. Little, Esq.

Attorney at Law

426 Route 36, suite 3

PO Box 382

Highlands, NJ  07732

732 708 1309, 732 391 2134 fax

anna@annaclittleesq.com

www.annaclittleesq.com

Attorney for Amicus Curiae

800-676-7856

## CORPORATION DISCLOSURE STATEMENT

Amicus states that it does not have a parent corporation, nor does it issue any stock.

## QUESTIONS PRESENTED

1. Does the State's legal recognition of man-man and woman-woman marriage violate the three prongs of lemon test under the Establishment Clause for lacking a secular purposes, for creating an indefensible legal weapon against non-observers, and for fostering the government's excessive entanglement with the religion of secular humanism, postmodern western moral relativism, and expressive individualism?

2. If marriage is a fundamental, individual, and existing right under the Equal Protection and Substantive Due Process Clause of the Fourteenth Amendment based on a personal and autonomous choice for self-identified homosexuals, isn't marriage a fundamental, individual, and existing right under the Equal Protection and Substantive Due Process Clause of the Fourteenth Amendment based on a personal and autonomous choice for self-identified polygamist, zoophiles, and objectofiles?

3. If homosexuality is not based on immutability and if parody marriages are not a part of American heritage and tradition does the Equal Protection and Substantive Due Process Clause of the Fourteenth Amendment, doesn't the Establishment Clause of the First Amendment have exclusive jurisdiction over all self-asserted sex-based identity narratives that are questionably real, questionably moral, and questionably legal, that are part of the religion of secular humanism, and that are not based on neutral, natural, non-controversial self-evident truth, like marriage between one man and one woman is?

4. Isn't true that the Plaintiffs have standing to proceed as taxpayers under *Flast v. Cohen*, 392 U.S. 83 (1968) and the right to plead alternative and even inconsistent claims under Fed. R. Civ. P. 8(e)(2) under *v. Black,* 196 F.2d 139 (10th Cir. 1952)?

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE
.................................................................................................................1

SUMMARY OF ARGUMENT
.................................................................................................................1

ARGUMENT
.................................................................................................................3

I.  Sexual orientation is not an immutable characteristic "determined solely by the accident of birth" and, thus, cannot be a suspect class
.................................................................................................................3

II.  Recognition of ex-gays as a group, by government authorities and other organizations, undermines the assertion that sexual orientation is immutable
.................................................................................................................5

III.  The life stories of thousands of ex-gays evidences that sexual orientation is not an immutable characteristic
.................................................................................................................7

A. Stephen Black's Story
.................................................................................................................8

B. Richard Cohen's Story
.................................................................................................................9

C. Melissa A. Ingraham's Story
.................................................................................................................11

D. Kristin J. Tremba's Story
.................................................................................................................13

IV. The ex-gay community is subject to more animus than any other minority group
.................................................................................................................15

CONCLUSION
.................................................................................................................21

**TABLE OF AUTHORITIES**
**Cases**

*DeBoer v. Snyder,*
772 F.3d 388 (6th Cir. 2014)
.................................................................................................................15, 21

*Edwards v. Aguillard,*
482 U.S. 578, 583 (1987).
.................................................................................................................1

*Frontiero v. Richardson,*
411 U.S. 677 (1973)
.................................................................................................................4

*Gomez v. Perez,*
409 U.S. 535 (1973)
.................................................................................................................4

*Graham v. Richardson,*
403 U.S. 365 (1971)
.................................................................................................................4

*Lyng v. Castillo,*
477 U.S. 635 (1986)
.................................................................................................................4

*McLaughlin v. Florida,*
379 U.S. 184 (1964)
.................................................................................................................4

*Oyama v. California,*
332 U.S. 633 (1948)
.................................................................................................................4

*Parham v. Hughes,*
441 U.S. 347 (1979)
.................................................................................................................4

*Perry v. Schwarzenegger,*
.................................................................................................................2

*PFOX v. Government of the District Office of Human Rights,* No. 2008 CA 003662, slip. op.
(D.C. June 26, 2009)
.................................................................................................................5

*Plyler v. Doe,*
.................................................................................................................4

*Quiban v. Veterans Administration,*
928 F.2d 1154 (D.C. Cir. 1991)
.................................................................................................................4

*Reed v. Reed,*
404 U.S. 71 (1971)
.................................................................................................................4

*Romer v. Evans,*
517 U.S. 620 (1996)
.................................................................................................................16

*Schweiker v. Wilson,*
450 U.S. 221 (1981)
.................................................................................................................1

*U.S. v. Windsor,*

133 S.Ct. 2675 (2013)
.................................................................................................16, 20

*Washington Ethical Society v. District of Columbia,*
101 U.S.App.D.C. 371, 249 F.2d 127 (1957)
.......................................................................................................1

*Ward v. Polite,*
.......................................................................................................15

*Welsh v. U.S,*
1970398 U.S. 333 (U.S. Cal. June 15)
.......................................................................................................1

**Other Materials**

American Association for Retired People (AARP) recently published an article telling the stories of senior adults whose sexual attractions and identifications changed over time (Dr. Pepper Schwartz, "Can Sexual Preference Change With Age?" http://www.aarp.org/home-family/sex-intimacy/info-2014/gay-lesbian-sexual-preference-schwartz.html?intcmp=AE-HOME-TOENG-TOGL)
.......................................................................................................7

African American ex-gay Grammy winner Donnie McClurkin removed from singing at Martin Luther King memorial concert following complaints by gay leaders (http://www.christianpost.com/news/ex-gay-community-baptist-leadership-say-dc-officials-are-infringing-on-pastors-civil-rights-102212)
.......................................................................................................19

District of Columbia Superior Court orders the D.C. Office of Human Rights to recognize ex-gays as a protected class for purposes of sexual orientation nondiscrimination (June 26, 2009), (http://pfox.org/Court-Rules-Sexual-Orientation-Laws-Include-Former-Homosexuals.html)
.......................................................................................................5

Chirlane McCray no longer identifies as a lesbian after marrying and having family with New York City Mayor Bill de Blasio (http://nypost.com/2012/12/11/bill-wife-speak-out; http://observer.com/2012/12/the-lesbian-past-of-bill- de-blasios-wife)
.......................................................................................................6

2 Encyclopaedia of the Social Sciences,
.......................................................................................................1

Ex-gays are reviled, ridiculed, and marginalized (http://www.christianpost.com/news/former-gay-activist-marries-woman-addresses-critics-who-condemn-his-new-heterosexual-lifestyle-110736)
.......................................................................................................17

Former homosexuals targeted because they exist
(http://www.nytimes.com/2011/06/19/magazine/my-ex-gay-friend.html?pagewanted=all&_r=0)
...................................................................................................................17

Center for Garden State Families (https://www.gardenstatefamilies.org)
...................................................................................................................1

Gay leaders criticize presidential candidate Barack Obama for allowing Donnie McClurkin to
sing at a fundraiser and insist he drop the singer from the program
(http://www.youtube.com/watch?v=A3jkeTdgLrg)
...................................................................................................................19

Gay, Lesbian and Straight Education Network (GLSEN), American Association of School
Administrators, and the Association for Supervision and Curriculum Development Guidelines
include recognition of ex-gays. (http://nea- exgay.org/2006/03/15/sexual-orientation-consensus-
guidelines-include-ex-gays)
...................................................................................................................6

Gay rights groups are wielding their considerable political power to aggressively oppose and
outlaw counseling and therapy for men, women and children who struggle with unwanted
same-sex attraction. These activities, carried on by organizations such as The National Center for
Lesbian Rights (http://www.nclrights.org/explore-the- issues/bornperfect/), Southern Poverty
Law Center (http://www.splcenter.org/conversion-therapy)
...................................................................................................................20

Human Rights Campaign (http://pfox- exgays.blogspot.com/2012/05/wacky-wayne- besen.html)
...................................................................................................................20

J. Archer, Faiths Men Live By 120—138, 254—313 (2d ed. revised by Purinton 1958)
...................................................................................................................1

Montgomery County Maryland public schools superintendent acknowledges the contributions of
an ex-gay representative on the district's Citizens Advisory Committee for Family Life and
Human Development (2011) (http://pfox- exgays.blogspot.com/2011/10/letter-posted.html)
...................................................................................................................5

NEA recognizes Ex-Gay Educators' Caucus (http://nea-exgay.org/about/)
...................................................................................................................6

PepsiCo's Corporate Counsel issues opinion memorandum on December 28, 2012
confirming ex- gays are protected from workplace sexual orientation discrimination
(http://pfox.org/CivilRights.pdf)
...................................................................................................................5

Recent judicial victories in same-sex marriage cases have empowered animus by equating the
legalization of same-sex marriage with the justification that ex-gays should therefore be banished
from society and not allowed to participate in the public square of ideas and commerce
(http://www.huffingtonpost.com/alec-fischer/this-is-what-happened-whe_1_b_6068712.html)
...................................................................................................................20

U.S. Department of Education's former Assistant Secretary of Safe and Drug Free Schools Kevin Jennings agrees on June 8, 2011 that ex-gays should not be discriminated against during outreach efforts for students with unwanted same-sex attractions (http://www.prnewswire.com/news- releases/departing-safe-schools-czar-met-with-pfox-to-discuss-ex-gays-123447044.html) ……………………………………………………………………………………………..5

Washington D.C. Mayor Adrian Fenty, in response to complaints from gay organizations, apologized for issuing a certificate of appreciation to an ex-gay organization. Yet in signing gay marriage legislation for the nation's capital, the mayor had promised equality for all D.C. residents (http://voices.washingtonpost.com/dc/2010/04/fenty_a pologizes_for_honoring.html) ……………………………………………………………………………………………19

World Bank removed Amicus Parents and Friends of Ex-gay & Gays, a non-profit corporation, from its charitable fundraising program after receiving complaints from the Human Rights Campaign, (http://www.hrc.org/press-releases/entry/hrc-to-world-bank-remove-pfox-from-your-community- connections-campaign) ……………………………………………………………………………………………19

## INTEREST OF AMICUS CURIAE

The Mission of The Center for Garden State Families is to protect and promote faith, freedom and the natural family, in culture and public policy.[1] The Center for Garden State Families is a national non-profit organization that has supported, since its inception, many thousands of families of individuals with unwanted same-sex attraction who have made the personal decision to leave homosexuality. The Center for Garden State Families advocates for the ex-gay community and educates the public about sexual orientation. The Center for Garden State Families appears as amicus to address the purported immutability of homosexuality, which is relevant to whether this Court should continue to declare that sexual orientation is a new suspect class or whether sexual orientation mythology is a matter of religion flowing from the church of Secular Humanism.[2] For purposes of the Establishment Clause Secular Humanism, legally recognized gay marriage and CADA violate all three prongs of the lemon test under the Establishment Clause for (1) being non-secular shams, (2) for creating an indefensible legal weapon against non-observers, and (3) for the government's excessive entanglement with the religion of secular humanism/moral relativism. "Secular Humanism" is religion according to the Supreme Court in *Torcaso v. Watkins*, 367 U.S. 488 (1961).[3] This brief shows that

---

[1] https://www.gardenstatefamilies.org/. The Center for Garden State Families focuses on Freedom of Religion Freedom of Speech, Freedom of the Press, The Right of Assembly Redress of Grievances, and opposing the alleged special rights of sexual minorities (LGBT).

[2] The Center for Garden State Families affirms sexual orientation is a fluid, transient, personal characteristic, and that individuals can and do change their sexual orientation and therefore self-asserted sex-based identity narratives that are questionably real, moral, and legal are not secular and are an extension of the church of Secular Humanism, Postmodern Western Moral Relativism, and Expressive Individualism. While all individuals are free to self-identify as whatever they want, neither the State nor the Federal Government can legally recognize parody marriages.

[3] See also *Washington Ethical Society v. District of Columbia*, 101 U.S.App.D.C. 371, 249 F.2d 127 (1957);; 2 Encyclopaedia of the Social Sciences, 293;; J. Archer, Faiths Men Live By

homosexuality has nothing in common with the Due Process and Equal Protection Clause and is a matter that is part of the religion of moral relativism/secular humanism. The Center for Garden State families takes the position that no individual should be permitted to enforce CADA because it is unconstitutional in its making and in its enforcement based on their self-asserted sexual orientation. It is true that if self-identified homosexuals can enforce CADA successfully against the Defendants, then self-identified polygamists and machinists must be permitted to do the same. The idea that the Defendants have been trying to slither out of this case for procedural reasons is troubling for many reasons. Jack Phillips could float the same failed argument here that he offered before the Colorado Court of Appeals in a similar case that the enforce of CADA against him is invalid because it infringes upon his freedom to express himself. But that is a defensive position that is far inferior to the controlling Constitutional argument provided by the Center For Garden State Families. It is far stronger position that CADA - itself - is unconstitutional in its making and in its enforcement under the First Amendment Establishment Clause as applied to the states under the Fourteenth Amendment and as to this Federal Court in the Fifth Amendment. The bottom line is that all Courts lack subject matter jurisdiction over sexual orientation civil rights statute. Alliance Defending Freedom has never made that argument in Federal Court to date for reasons that seem suspicious at best.  The Center for Garden State Families makes that that position now on behalf of the Defendants, but at the same time stipulates that if self-identified homosexuals can enforce CADA against the Defendants, then so can Plaintiffs who self-identify as either polygamist or objectophile.

---

120—138, 254—313 (2d ed. revised by Purinton 1958);; Stokes & Pfeffer, supra, n. 3, at 560;;;; *Welsh v. U.S*, 1970398 U.S. 333 (U.S. Cal. June 15);; *Edwards v. Aguillard,* 482 U.S. 578, 583 (1987).

## SUMMARY OF ARGUMENT

This brief confirm[4]s the growing recognition of the ex-gay community by the courts,

government bodies, and business entities and presents the real-life, personal stories of four

individuals who have done exactly what the district court in *Hollingsworth v. Perry*[5] concluded

was impossible: they chose to change their sexual orientation and now live in opposite-sex

relationships despite having been previously deeply entrenched in same-sex relationships.

Anyone with common sense would celebrate the fact that people can and do convert out of the

self-serving LGBTQ religion completely.  The stories provided here demonstrate that, in fact,

sexual orientation is not immutable—either in the sense that it is a trait determined solely by

"accident of birth" or in the sense that it cannot be changed— but is a fluid, transient, personal

characteristic that can and does change. The LGBTQ community is a church. It is a faith-based

group with its own private moral code and religious symbols, like the Gay Pride Rainbow

Colored Flag.  There are millions of people living in the United States who do not want their

taxpayer dollars going to promote and advance the LGBTQ communities religious beliefs about

sex, faith, truth, morality, and marriage. These taxpayers do not want their taxpayer dollars going

towards legislatures who make sexual orientation statutes and towards that courts that enforce

such unconstitutional laws. While Alliance Defending Freedom may want its taxpayer dollars

going towards the enforcement of CADA, the amicus certainly does not.  This is not a game of

money and politics to the amicus filer, these can be matters of life and death for ex-gays.

---

[4] No counsel for a party authored this brief in whole or in part, and no counsel or party made a monetary contribution to the preparation or submission of this brief.

[5] Finding of fact No. 46 stated: "Individuals do not generally choose their sexual orientation. No credible evidence supports a finding that an individual may, through conscious decision, therapeutic intervention or any other method, change his or her sexual orientation." *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 966 (N.D. Cal. 2010).

The issue is important because the Courts can longer pretend that sexual orientation is immutable declaring it a "suspect class" for purposes of the Equal Protection Clause in light of overwhelming evidence that to suggest otherwise is an act of Constitutional malpractice and intellectual dishonesty. Falsely treating sexual orientation as a civil rights matter improperly subjects state laws or state Constitutional provisions to "strict scrutiny" rather than the existing, legally appropriate, "rational basis" review.  But more than that any sexual orientation is a religious mythology and not a matter of civil rights whatsoever so all statutes like CADA are this very instance unenforceable by any Court to include the this one, the Colorado Civil Rights Commission, and the United States Supreme Court itself.

This brief does not detail the extensive medical and scientific evidence corroborating that sexual orientation in changeable and mutable, as that issue has been thoroughly briefed by amicus filers in similar controversies by Dr. Paul McHugh, M.D., University Distinguished Service Professor of Psychiatry at the Johns Hopkins University School of Medicine. Rather, this brief personalizes the scientific and medical evidence via powerful biographical stories representing the actual experiences of many thousands of former homosexuals. It concludes with a discussion of the significant animus ex-gays experience, largely at the hands of gays, as a result of the unwarranted commitment to the gay immutability narrative. While is was self-identified homosexuals who imposed gay marriage on all 50 states by colluding with the Secular Humanist on the bench through a series of irrelevant emotional appeals, it will be testimony of ex-gays that ends it for all 50 states, since gay marriage is a matter of religion and is a non-secular sham that manages to violate all three prongs of the lemon test by a landslide. The wrong Constitutional narrative was being litigated in *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015). The right

Constitutional argument is that legally recognized gay marriage violates the lemon test under the

Establishment Clause for excessive entanglement. Just as legally recognized Gay marriage is a

sham, so is CADA. It is not just that CADA's enforcement is invalid under the Freedom of

Expression Clause as Jack Phillips argues before the Supreme Court - and it is - it is also the case

that the making and the enforcement of CADA is completely invalid under the Establishment

Clause. That means that no court has subject matter jurisdiction over enforcement to include the

Federal Court and the Colorado State administrative law courts. The Amicus is neither a friend to

the Plaintiffs nor a friend to the Defendants. The Amicus is only a friend to this Honorable Court

insofar as it has a duty to uphold the Constitution in light of the actual evidence and not in light

of what it wishes the evidence was. While Alliance Defending Freedom has refused to raise such

arguments to overrule CADA under the Establishment Clause, the Amicus filer takes the position

asserted by the Plaintiffs in *Sevier et. al. v. Hickenlooper et. al.,* 17-cv-1750 (C.O.D. 2017) that

CADA is invalid and that no individual should be allowed to enforce it based on their

self-asserted sex-based identity narrative. The fact that the Plaintiffs filed this action to enforce

CADA against Jack Phillips and then an action against the State of Colorado in *Sevier et. al. v.*

*Hickenlooper et. al.,* 17-cv-1750 (C.O.D. 2017) to enjoin the state from enforcing CADA is

nothing short than a complete indictment of the integrity of the judiciary writ large. But just as

Alliance Defending Freedom will defend the true client which is to maximize donations, the

Secular Humanist on the bench will likely defend their baby "gay marriage" from being aborted

by the the Establishment Clause. The amicus is here to defend the Constitution from both the

secular humanists plaintiffs, the secular humanist on the bench, and Jack Phillip's counsel who

seems to be more concerned with fundraising against religious persecution than making the

correct Constitutional argument that would actually allow their clients to prevail in one of these

fake civil rights matters. While homosexuality, polygamy, and objectophilia, as a civil rights

matter, is fake, the suffering produced by unconstitutional statutes like CADA is very real.

## ARGUMENT

### I. Sexual orientation is not an immutable characteristic "determined solely by the accident of birth" and, thus, cannot be a suspect class.

As expounded in Professor McHugh's brief in *Obergefell v. Hodge*, 192 L. Ed. 2d 609

(2015), sexual orientation fails this Court's standard for heightened scrutiny because it is not

immutable when it comes to cases where the government is a defendant, which is not the case

here. The Court lacks subject matter jurisdiction over all issues dealing with sexual orientation

because the Establishment Clauses bars the government from even coming near the subject.

Every class to which the Supreme Court has applied heightened scrutiny is defined by an

immutable characteristic.[6]  Moreover, the Supreme Court has refused to apply heightened

scrutiny to classes that are not marked by an immutable characteristic.[7] The Court's

jurisprudence makes clear that immutability is a necessary condition for recognizing a new

protected class.

The Court's precedents teach that immutability denotes a characteristic "determined

solely by the accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973). As

then-Judge Ginsburg explained, "the 'immutable characteristic' notion . . . does not mean,

broadly, something done that cannot be undone. Instead, it is a trait 'determined solely by

---

[6] *Parham v. Hughes,* 441 U.S. 347, 351 (1979) (citing *McLaughlin v. Florida*, 379 U.S. 184 (1964) (race); *Oyama v. California*, 332 U.S. 633 (1948) (national origin); *Graham v. Richardson*, 403 U.S. 365 (1971) (alienage); *Gomez v. Perez*, 409 U.S. 535 (1973) (illegitimacy); *Reed v. Reed*, 404 U.S. 71 (1971) (gender)).
[7] *E.g., Plyler v. Doe*, 457 U.S. 202, 220 (1982) (undocumented aliens); *Lyng v. Castillo*, 477 U.S. 635, 639 (1986) (close relatives). T

accident of birth.'"[8]   Far from being an immutable characteristic determined at birth like race or gender, sexual orientation is a complex and amorphous phenomenon that defies consistent and uniform definition. The evidence embodied in this brief adds to the scholarly record amassed by Professor McHugh to show that, however defined, sexual orientation can shift over time and does shift for a significant number of people. Indeed, many individuals freely choose to change their sexual orientation. Thus, while the nature and determinants of sexual orientation are not fully understood, sexual orientation is mutable for purposes of Equal Protection analysis, as it is not "determined solely by accident of birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality).

## II. Recognition of ex-gays as a group, by government authorities and other organizations, undermines the assertion that sexual orientation is immutable.

In addition to the compelling personal stories of ex-gays discussed below, a growing number of governmental authorities, organizations, and influential individuals recognize the existence of ex- gays; that is, that there are individuals who have successfully changed their sexual orientation and are now living as heterosexuals even though they once lived as homosexuals. This is because homosexuality is a religion.  Polygamist and objectophilia are different denominational sects within that overall same religion of expressive individualism.  All self-asserted sex-based identity narratives that fail to check out with the human design are nothing more than a series of unproven faith based assumptions that can only be taken on faith and are at the very least implicitly religious. The very existence of CADA is the definition of the government entanglement with the religion of secular humanism in violation of prong one and

---

[8] *Quiban v. Veterans Administration*, 928 F.2d 1154, 1160 n.13 (D.C. Cir. 1991) (quoting *Schweiker v. Wilson*, 450 U.S. 221, 229 n. 11 (1981)).

two of lemon. It goes without saying that for any court to allow any individual to enforce CADA violates prong two of lemon in terms of its effects.

In *PFOX v. Government of the District Office of Human Rights,* No. 2008 CA 003662, slip. op. at 12 (D.C. June 26, 2009), the District of Columbia Superior Court ordered the D.C. Office of Human Rights to recognize ex-gays as a protected class for purposes of sexual orientation nondiscrimination.[9] Likewise, Kevin Jennings, former Assistant Secretary of Safe and Drug Free Schools, U.S. Department of Education, agreed in 2010 that ex- gays should not be discriminated against during outreach efforts for students with unwanted same- sex attractions.[10] The superintendent of Montgomery County, Maryland public schools, the 17th largest school district in the United States, in 2011 acknowledged the contributions of an ex-gay representative who served on the district's Citizens Advisory Committee for Family Life and Human Development.[11] On December 28, 2012, PepsiCo, a Fortune 500 company, by and through its legal counsel, acknowledged in a written legal opinion memorandum that its workplace policy against sexual orientation discrimination includes non- discrimination against former homosexuals as a protected class.[12]

According to Charles Haynes, primary drafter of the Public Schools and Sexual Orientation Consensus Guidelines released by the First Amendment Center, the ex-gay viewpoint in public schools should be heard. The Guidelines are endorsed by the Gay, Lesbian and Straight Education Network (GLSEN), American Association of School Administrators, and

---

[9]http://pfox.org/Court-Rules-Sexual-Orientation-Laws-Include-Former-Homosexuals.html
[10](http://www.prnewswire.com/news-releases/departing-safe-schools-czar-met-with-pfox-to-discuss-ex-gays-123447044.html).
[11] (http://pfox-exgays.blogspot.com/2011/10/letter- posted.html).
[12] (http://pfox.org/CivilRights.pdf).

the Association for Supervision and Curriculum Development. [13]And every year, the National Education Association's officially recognized Ex-Gay Educators Caucus participates in and hosts a booth at the NEA's conference.[14] Just a as a person can convert from Judaism to Christianity or Christianity to Islam, a person can convert their identity narrative from straight to machinist to polygamist to heterosexual.[15]

On a partner website of the *amicus* are the video-recorded testimony of twenty three former homosexuals telling their personal stories of how they came to identify as ex-gay (http://www.pfox.org/personal- stories), including the journeys of former homosexuals whose identical twins did not experience same-sex attraction.[16] Transformation of same-sex attraction is so well recognized that the American Association for Retired People (AARP) recently published an article telling the stories of senior adults whose sexual attractions and identifications changed over time.[17] The article notes that some who identified as heterosexuals experience same-sex attractions as senior adults, while some who identified as gay or lesbian later experience opposite-sex attraction. Just because an emotion arises does not mean that the government should encourage the giving into emotions that are subversive to human flourishing and do not check out with our self-evident design.

---

[13](http://nea-exgay.org/2006/03/15/sexual-orientation-consensus-guidelines-include-ex-gays).

[14] (http://nea-exgay.org/about)

[15] Chirlane McCray, a former lesbian, is married to New York City Mayor Bill de Blasio. In 1979, McCray wrote a front-page article for Essence magazine declaring, "I am a lesbian." But she met Mr. de Blasio, fell in love, and began a family with him. She no longer identifies as lesbian (http://nypost.com/2012/12/11/bill-wife-speak-out; http://observer.com/2012/12/the-lesbian-past-of-bill- de-blasios-wife)

[16] https://vimeo.com/100937787; https://vimeo.com/84169427

[17] Dr. Pepper Schwartz, "Can Sexual Preference Change With Age?"http://www.aarp.org/home-family/sex-intimacy/info-2014/gay-lesbian-sexual-preference-schwartz.html?intcmp=AE-HOME-TOENG-TOGL

### III. The life stories of thousands of ex-gays evidences that sexual orientation is not an immutable characteristic.

Any assertion that homosexuality is immutable is perhaps best disputed by the existence of a multitude of organizations in the United States and around the world who, like Amicus, have helped thousands of men and women leave unwanted homosexuality, change their orientation, and live heterosexual lives.[18]  The government - to include the Court - cannot engage in intellectual squinting in pretending that gay rights are like "race-based-civil rights," which are actually based on immutability. To do so is an act of fraud that amounts to racism in kind that manages to be both racially and sexually exploitative. The Court cannot ignore this evidence without committing Judicial, Political, and Constitutional malpractice. Below are the stories of four individuals, two men and two women, each of whom represents many thousands of others who have successfully made this transition. The fact that there are well-adjusted former homosexuals evidences that sexual orientation is not an immutable characteristic, that sexual orientation is a religious mythology floated by the church of Secular Humanism, and that the Establishment Clause has exclusive jurisdiction over whether the government can or cannot

---

[18] In addition to Amicus, a partial list of the other organizations who in the United States and around the world provide assistance to those desiring to change their orientation is as follows: Courage (www.couragerc.net); The German Institute for Youth and Society (www.dijg.de); Homosexual Anonymous (www.ha-fs.org); International Healing Foundation (www.comingoutloved.com); Jews Offering New Alternatives for Healing, Inc. (http://jonahweb.org); Alliance for Therapeutic Choice and Scientific Integrity (www.therapeuticchoice.com); Restored Hope Network (www.restoredhopenetwork.com); Voices of Change (www.voices-of-change.org); Witness Freedom Ministries (http://www.witnessfortheworld.org); Parakaleo (www.parakaleo.co.uk); People Can Change (http://www.peoplecanchange.com); Positive Alternatives to Homosexuality (PATH) (http://www.pathinfo.org); True Freedom Trust (http://www.truefreedomtrust.co.uk); VENSER (http://www.venser.org); Regeneration Ministries (http://www.regenerationministries.org).

legally respect self-asserted sex-based identity narratives. It cannot - because doing so causes the government to violate all three prongs of lemon.

### A. Stephen Black's Story

Stephen Black is an ex-gay who, after coming out of the homosexual lifestyle more than thirty years ago, married his wife Robin in 1986. They have three adult married children, one of whom is deceased, and two grandchildren. Stephen is an ordained minister and serves as the Executive Director of First Stone Ministries. Steve's journey is found at https://vimeo.com/84171226. Following are excerpts from his story, which proves that homosexuality is not immutable and has nothing in common with the Fourteenth Amendment.

"Sex became a distorted issue for me at an early age. I was molested about age six by a male friend of the family who was babysitting me. I was also exposed to some pornography at the same time. The porn was heterosexual, yet very devastating to my understanding of real love and sexuality. Several years later, our next-door neighbors had some out-of-state visitors. I was playing at their house, and was followed into the garage by the adult male visitor. He grabbed me from behind and began to molest me while warning me to keep quiet. After struggling with him for a few minutes, I got away. I was terrified at what had happened. I went home and never told anyone. I thought it was my fault, because in the heat of the summer, I had been wearing cut-off shorts with no shirt. About a year later, my family went on a trip to Colorado. We stayed with friends who had a son several years older than me. At bedtime, he began telling me about a "game" he had learned from a friend. That night, I was molested again, except this time I submitted to it because it was just a "game." A year later, he came to visit at my house and we "played the game" again. As I went through high school, I met other homosexual men and started going to gay bars. Soon I had a new goal: to be "married" to another man. Over the coming years, I pursued a marriage-type relationship with several men. I had one relationship that lasted two years. During this time, I started going back to the Catholic church. I was going to college and began living openly as a homosexual. My lover, Mike, was very wealthy and we lived in a beautiful home. I drove a new convertible and traveled to a lot of places.  Several months later, my little brother died. We were only 18 months apart and, for the first time in years, I began praying earnestly.  My relationship with Mike ended in a horrible fight; then I joined a health club, where I met a guy I thought was straight. But he had been exposed to homosexuality one other time earlier in his life, and was plagued with gay thoughts. Before long, we were sexually involved, even though he was married. I was torn up with guilt and developed an ulcer. My relationship with Mike ended in a horrible fight; then I joined a health club, where I met a guy I thought was straight. But he had been exposed to homosexuality one other time earlier in his life, and was plagued with gay thoughts. Before long, we were sexually involved, even though he was married. I was torn up with guilt and developed an ulcer.  My former lover would call me up,

crying over the phone and begging me to reconsider my decision to leave him. But the Lord led me to a wonderful church where people really loved Him. I began meeting weekly with my pastor, who became a spiritual father to me. He helped me to deal with the underlying root issues of my homosexual struggles, such as lust, anger and unforgiveness I also had to deal with the reality of being sexually abused as a child. When the anger and bitterness came pouring out, several men and women in my church prayed with me and ministered God's healing to my broken heart.   Some months later, Robin began attending my church. We became friends and were eventually married on May 25, 1986. Today we have a very fulfilling marriage and are parents of three children [one deceased] and [two] grandchild[ren].  Marriage with a woman has brought me a deeper understanding of what it means to be a man. And marriage has revealed how selfish I really was, and how much I need to die to myself every day and love my wife like Christ loves the Church (Eph. 5:25)." [19]

It is clear from this testimony that homosexuality is a matter of religion and that it has nothing to do with immutability or the Fourteenth Amendment. In fact, since the Supreme Court pretended otherwise *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015) must be overruled and legally recognized gay marriage is a non-secular sham. Like the Defendants but unlike the Defendants counsel, the Amicus does not want its taxpayer dollars going toward entangling the government with the religion of Secular Humanism, Postmodern Western Individualistic Moral Relativism, and Expressive Individualism.

### B. Richard Cohen's Story

Richard Cohen, M.A., is an ex-gay who is now married with 3 children. He struggled for much of his life with unwanted same-sex attraction. Richard is the founder of the International Healing Foundation (IHF) and the author of Coming Out Straight, Gay Children Straight Parents, Let's Talk About Sex, and Alfie's Home. Richard's journey is found at www.comingoutloved.com/Richard-Cohens- Story. Following are excerpts from his story, which proves that homosexuality is not a matter of immutability but is a matter of religion:

"From middle school, I began to ex43perience same-sex attractions.. . . My same-sex desires got stronger with each passing year. I had more sexual experiences with school friends. For them it

[19] https://vimeo.com/84171226

was a novelty, but for me it was a growing obsession. At the same time, I tried to act "normal," so I had girlfriends. But this growing obsession for a man continued to haunt me. . . In my first year of college, I had several boyfriends, each lasting several months. After one visit home, my father wrote a letter that hurt me deeply. At the same time, I felt suffocated by my current boyfriend, Mike. Besides all that, my schoolwork was overwhelming. I decided to take a bottle of Bufferin and end it all. However, I woke up in the middle of the morning sick as a dog, and still alive. I called my sister, who lived nearby. She came over and took me to the emergency room at the hospital where they pumped my stomach and stabilized my condition. I recovered, continued therapy, went back to school, ended my relationship with Mike, changed my major to theater, and felt a bit more hopeful. In my second year of school, I met Tim, an art major. We would become lovers for the next three years  Since I loved Tim, I wanted to see why he loved . . . Jesus so much. For the first time in my life, I began reading the New Testament. As part of my Jewish upbringing, I was both bar- mitzvahed and confirmed, studying only the Old Testament.

I had always been on a spiritual quest, trying to find the meaning and purpose of life. I tried so many kinds of faiths and ways: Judaism, Buddhism, and therapies. Then I met Jesus. He was a remarkable individual. In fact, he was the kind of man I had always wanted to be myself. What I admired in him was that his thoughts, feelings, words, and deeds were one. He was a congruent man, the same inside as he was on the outside. He spoke of forgiveness and God's grace. These were new concepts for me. I wanted to be like him. This began my journey as a Christian. . . .More and more, Tim and I knew that homosexuality was not compatible with God's Word, so we eliminated the physical part of our relationship

In 1982, Jae Sook and I married . . . . The first few months were wonderful. I told her about what I thought was my homosexual past. Then the problem resurfaced. I felt so much rage toward my wife. I projected onto Jae Sook all the pent-up hostility I had previously felt toward my mother.. . . At home, Dr. Jekyll turned into Mr. Hyde, a rageaholic. I had become what I vowed I would never be—just like my father. My wife soon became pregnant with our first child. I knew I must begin therapy again. So, in May 1983, while living in New York City, I went to see a noted psychologist. For one year, I attended weekly individual and group sessions........ Slowly, my heart began to heal as I grieved the effects of the sexual abuse [from my youth] . . . . However, there was still a deep wound in the pit of my soul. We had had a second child during all this. Jessica was a beautiful girl.....I found a . . . friend who was willing to help me heal the homo- emotional wounds of my past. He himself was quite stable and comfortable in his masculinity. . . .In that instant, the connection between my childhood abuser and I was cut, and I became free for the first time in my life. With that sense of freedom, I sobbed for about an hour in [my friend] David's arms. It was such a release and relief to know that I wasn't responsible for what had happened and that God had forgiven me. In those moments of release, I found my freedom from same- sex desires. Cutting this neurological connection to the sexual desires freed me from thirty years of relentless pain and an endless pursuit of men.

At the same time, I began graduate school to obtain my master's degree in counseling psychology. After graduation . . . I founded the International Healing Foundation. My vision was to establish healing centers throughout the world to help men, women, and children to experience their value as children of God. This is still my vision, as we continue our journey.  I began to give public presentations on the process of transitioning from homosexuality to heterosexuality. I

thought that, because of my heart toward the homosexual community, they would see that I was not their enemy, but just presenting another possibility for those who desire to change. I was naïve. We received death threats at our home and at my office! We received obscene telephone calls at home with angry, venomous words of threat and accusation. The Gay and Lesbian Task Force of the mayor's office in Seattle requested that the American Red Cross fire me from my position as an HIV/AIDS educator. Many in the homosexual community have felt threatened by my work. I understand their fears and their pain.     Over the past 21 years, I have traveled extensively throughout the States, giving presentations about the healing of homosexuality on college and university campuses, in churches, in mental health institutions, at therapeutic conferences, and on TV and the radio.     Another blessing occurred 15 years ago. God gave us a precious son, Alfie. He came on the foundation of our (God's) battles and victories. Now, Jae Sook and I and our three children are growing more deeply in love.

    I love God with all my heart, mind, and soul. I live to end His suffering and pain. I pray the understanding of same- sex attractions and the treatment plan for recovery that I am about to share is a blessing to you and those whose lives you will touch. I have learned over the past twelve years of counseling hundreds of men, women, and adolescents, and working with thousands of people in healing seminars around the world, that no matter what issue or issues we are facing in our lives, our wounds all originate from the same sources. . . ."[20]

The take-away from this testimony is that shoehorning gay marriage policy into Equal Protection

and Substantive Due Process narratives in order to justify the codification of religious ideology

that is questionably real, questionably moral, and questionably legal is flagrantly dishonest. The

correct Constitutional narrative is that the government cannot legally recognize parody

marriages, although individuals are permitted to self-identify as anything they would like.

Because Gay marriage policies are completely unconstitutional so is the making and the

enforcement of CADA. While the Amicus disagrees with Plaintiffs in this case adamantly, the

Amicus completely supports the Plaintiffs positions in 17-cv-1750 that both CADA and gay

marriage are totally invalid at this very instance for violating all three prongs of lemon. Many

faith-based organizations are appalled at Alliance Defending Freedom for lacking the intellectual

integrity raise defenses based on Constitution that puts them on the offense, instead of their

cop-out defensive strategy that puts their client on the defense and risks further unwarranted

---

[20] www.comingoutloved.com/Richard-Cohens-Story.

prosecutions by the disciples of Secular Humanism. If Alliance Defending Freedom was actually concerned with prevailing in a controversy, they would pick the Constitutional battlefield instead of allowing LGBTQ lobbying groups like the LGBTQ to select the battlefield for them. Take the revolutionary war. The way America won the Revolutionary war was not to follow the rules of engagement created by the crown. No indeed! Instead of marching out in the fields to fight the British on their terms, the American Militia hid behind trees and picked off the British Soldiers. Alliance Defending Freedom and the ACLU are entangled in some kind of quid pro quo war. The ACLU has picked the Constituitonal battlefield by framing gay rights and CADA as civil rights matters arising under the Fourteenth and Fifth Amendments Due Process and Equal Protection Clause. The ACLU leads ADF around by the nose ring and both make millions in donations as a result. The ACLU pushes to enshrine the religion of Secular Humanism and ADF uses fear to generate donations to only moderately fight back so as to not jeporadize the arrangement. The cycle continues. ADF and the ACLU use one another but they are both a threat to American Democracy. The amicus drags these matters - perhaps kicking and screaming - out of the Fourteenth Amendment box and places it squarely within the confines of the Establishment Clause. The amicus has redrawn the Constitutional battlefield.  In upholding the Constitution, the Court should hold that itself as well as all other courts lack subject matter jursidiction to enforce CADA because doing so violates the lemon test under the Establishment Clause.

### C.  Melissa A. Ingraham's Story

Melissa A. Ingraham, who formerly identified as a "lesbian," resides with her husband Garry Ingraham, who is ex-gay, and two sons in Maine, New York. Melissa's identical twin

sister never struggled with same-sex attraction. Melissa has a Master's degree in Counseling and was licensed as a professional counselor in New York in 2010. Melissa's story can be viewed at https://vimeo.com/84169427.  Following are excerpts from her story which proves that it is an act of intellectual dishonest and Constitutional malpractice to pretend that homosexual ideology is not a matter of religion and is instead a matter of immutability like race is:

I grew up in a church-going family with an older brother and an identical twin sister. My father's business kept him on the road a lot, and by the time I reached high school, he was no longer coming home regularly. My parents hadn't agreed to separate, and as far as I knew, my mother never confronted him about leaving.I held a lot of anger inside towards my father. I also saw my mother as weak, passive, and a victim for not standing up for herself in the marriage. I vowed never to be like her— emotionally and financially dependent on a man. That vow profoundly impacted my relationships and my view of myself as a woman. In the moment I made that vow, I put a wall between my mother and myself, rejecting everything feminine, both the good and the bad. I believed that it was not safe or advisable to be a woman. This belief was further confirmed through my violent encounters with my brother when we would be home after school. We both had terrible tempers, and fought horribly. I always wound up on the losing end, feeling beat up and unprotected because my parents weren't there.                Beginning in high school and continuing through college, I was involved in several long-term, emotionally-dependent, sexual relationships with men. Reflecting on those relationships, I can see that I was searching for the affirmation, acceptance and worth that I had never received from my father. He wasn't around to bless me as a woman, and say, "You are okay, you are beautiful, you are acceptable." Although I claimed to be the one in control, on the inside I desperately needed to be with someone to have an identity.  I became engaged in my sophomore year of college, but I wasn't happy. Through conversations and other circumstances, I began to question my sexuality. I broke off the engagement, and after a year of confusion and searching, I entered a lesbian relationship. It lasted only a short time, but it was emotionally intense. I was devastated when it ended.  I was torn. I knew that my lesbian relationship was "wrong", and yet I felt that I had finally found what I was looking for—to be loved and cared for, and to be understood, affirmed, and accepted. The deficit of feminine love caused by my rejection of my mother cried out to be filled in the arms of a woman.  Interestingly, right before I left for Christmas break, I confided to a campus minister that I was struggling with lesbianism. He told me it was okay to be gay and Christian. There it was. I could have the best of both worlds. And yet, there was no peace in that answer.
        Over Christmas, my sister invited me to attend a Christian conference. I agreed to go, and attended a workshop on sexual wholeness . . . . I gave my life to Christ and repented of my lesbian relationship that day. The veil was lifted from my eyes, and I saw how I had been deceived into thinking that lesbianism was God's best for me because it felt so right.  When I joined the Living Waters program offered by Regeneration in 1999, I found a place where I could be real about my sexual struggles and my brokenness. I began to understand the impact of the messages I had received from my family about men, women, and marriage. I also gained a

great deal of insight into why I related to people in such broken ways and out of such great need. I learned how to forgive my parents and others, which allowed me to receive love from them in a deeper way. I also learned to confess my sins against God, my family, and others, and to receive forgiveness. Some of the sins I confessed were perfectionism, a need to be in control, relational idolatry, hatred of men, hatred of women, and self- hatred. I received truth about my identity in Christ—that I am a beloved, precious, beautiful, and cherished daughter of the King! My small group leaders and the leadership team affirmed my femininity and the goodness of being a woman. I could now enter into godly relationships with men and women, free to be who God created me to be.

I experienced unparalleled freedom, and God began to birth a desire in me to help others in the healing process. . . .[I] pursue[d] a Masters Degree in Counseling. I graduated in August of 2006 and was licensed as a professional counselor in New York in 2010.. . . . I have wonderful, healthy friendships, and I am closer to my family. In the fall of 2004, I met my husband Garry. We were married in 2007, and now have two sons. It is difficult for me to describe the miracle of our marriage and how it really is an outward reflection of an internal reality. For me, being with Garry is about so much more than not being with a woman. God truly has restored my femininity and sexuality. God has shown me the fullness of a heterosexual relationship where both people are submitted to His will.[21]

The implication of this testimony is that the Establishment Clause is the ultimate DOMA sec 3.

The Establishment Clause is the National marriage ban. Homosexuality has absolutely nothing to

do with immutability. There are no "gay people." Homosexuality is an exploitative ideological

worldview that people buy into as a part of man's search for meaning. It is a worldview that is

more or less a trap for the unwary that dehumanizes and exploits its victims, which seeks to

justify sexual conduct that is questionably legal and moral. There are millions of Americans who

do not want their taxpayer dollars going towards the governments entanglement with the religion

of secular humanism, which sodomic marriage and CADA perpetuate and promote. The point

here is that this Court lacks subject matter jurisdiction over CADA to enforce it because doing so

is barred by the Establishment Clause. This means that no individual - no matter what their

self-asserted sex-based identity narrative is - can enforce CADA for so called discrimination on

the basis of sexual orientation.  Yet, the Plaintiffs attempts to uses CADA to harangue and

---

[21] https://vimeo.com/84169427

persecute a man with the kind of honor and humility as Jack Phillips is as equally

Constitutionally asinine as the self-identified homosexuals attempts to harangue and punish Jack

Phillips under the same fake civil rights statute in the controversy pending before the United

States Supreme Court.  While Defense counsel has already attempted to slither out of this

controversy based on silly procedural grounds, if they were to both to honor their ethical

obligations owed to their client and to the Constitution, they would raise the Constitutional

defenses that the amicus is offering to the Court so that it can find and apply the law.  Instead,

ADF is complicit with the homosexual lobby and is focused on its real client - itself.  At some

point ADF might want to try to remember that  "the love of money is a root of all kinds of evil.

Some people, eager for money, have wandered from the faith and pierced themselves with many

griefs." 1 Timothy 6:10.  The amicus has no financial interest in this controversy. The amicus

interest is found in a desire to uphold the integrity of the Constitution from those who threaten it.

### C. Kristin J. Tremba's Story

Kristin J. Tremba, M.Div., is a former lesbian who is now married with a child. Kristin

holds a Master of Arts degree from Columbia University, as well as a Master of Divinity degree

from Gordon- Conwell Theological Seminary. She serves as director of Exchange Ministries and

is the author of Sexual Wholeness in a Broken World. Her journey is found at

http://pfox.org/Grove_City_College.pdf. Following are excerpts from her story which prove

beyond any doubt that the Supreme Court in *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015) was

outright lying when it found that parody marriages are a matter of civil rights and not a matter

that is government under the exclusive jurisdiction over the Establishment Clause:

While my sister was attending [college], I was going to a small liberal arts college in Indiana.
My freshman year I had high hopes to have fun at school, make lots of friends find my "calling"
in life, and then get married. Instead, I found something unexpected and frightening happening: I

was falling in love with my freshman roommate. The feelings I felt for her were the feelings I had hoped to have felt for the guys I had dated in high school. I was overwhelmed and confused and had nowhere to go. . . .    My roommate and I lived together all throughout college and one year after college, but we never talked about our feelings for one another or engaged in any physical sexual relationship. Regardless, we were a couple. We were emotionally dependent upon each other (we viewed other people as a threat to our relationship, preferred to spend time alone and were frustrated when this didn't happen, became angry or depressed when the other withdrew slightly, lost interest in other friendships, and experienced romantic and sexual feelings for the other) . . . . After college, I entered the Peace Corps, which required me to leave my roommate. This was not easy for either of us. However, on my flight to Albania, I prayed that God would bring a man into my life. Thus began my search for love and the hopes to marry again. I was 23 years old. In Albania, I found myself having sexual feelings for both men and a particular woman as I served as a volunteer. I lost my virginity and became more promiscuous with men.

It was not soon after this that I fell into a sexual relationship with a woman who was openly gay, and who pursued me. In my loneliness and neediness for intimacy, I gave in to her and found being with her to meet a deep emotional need inside of me. This relationship continued until I moved to a different state for work. When I heard that she would be coming to live with me, I was euphoric and ready to come "out" of the closet, so to speak. I began telling friends, and I even attended a gay-friendly church, but it all seemed so foreign and unsatisfying . [Ultimately,] God taught me that sexual sin was my attempt to meet legitimate emotional needs in sexually illegitimate ways. He showed me that there were some emotional needs that had not been met in my family relationships growing up, there were some wounds, and so I was attempting to meet these needs and cover these wounds in sexual relationships as an adult. He taught me that there were also things I was born with: a sin nature, a particular temperament, various weaknesses, and a negative body image and negative view of my femininity. He taught me that even though I did not choose all my circumstances and struggles, I could choose to overcome them. I could choose to let God change my life.People ask me, "Do you still struggle with same-sex attraction?" My answer is no, I don't, but I still struggle with worry and doubt and lots of other things . . . . [22]

The inescapable take-away from the testimony is that the Supreme Court in *Obergefell* was dead

wrong in pretending that sexual orientation is a matter that had anything to do with the

Fourteenth Amendment. Instead, the evidence clearly shows that the Establishment Clause has

exclusive jurisdiction over marriage matters and completely prevents all 50 states from legally

recognizing any form of parody marriage as a matter of Constitutional preemption. Her

---

[22](http://pfox.org/Grove_City_College.pdf.)

testimony demonstrates with convincing clarity that self-identified homosexuals have no right to enforce CADA any more than self-identified polygamist and machinists do.

## IV. The ex-gay community is subject to more animus, intolerance, and discrimination than any other minority group

The dramatic ascendency of GLBT political power and legal victories in recent years have been tragically accompanied by the diminution of rights of conscience and religious freedom.[23] Indeed, the rising tide of "sexual-liberty" has not lifted all boats. No other minority group has endured the brunt of growing intolerance, moral-cultural approbation, and derision more during this time of cultural upheaval than have former homosexuals.

Sadly and ironically, the primary instigators of ex-gay animus have been the very same gay rights groups and individuals who were themselves recently demanding social "tolerance" and "respect" for same-sex lifestyles and marriage. As the U.S. Court of Appeals for the Sixth Circuit observed, "[t]olerance," like respect and dignity, is best traveled on a "two-way street." *DeBoer*, 772 F.3d 388 at 410 (6th Cir. 2014), quoting *Ward v. Polite*, 667 F.3d 727, 735 (6th Cir. 2012). Yet, because ex-gays are a living rebuke of the inconvenient truth that that same-sex attraction is not immutable for Equal Protection purposes, former homosexuals have increasingly been subjected to very "unfriendly fire" from some of their gay brothers and sisters who have sought to delegitimize them out of existence.  The *Windsor* majority stated that in "determining whether a law is motivated by an improper animus or purpose, 'discriminations of an unusual character' require careful consideration." *U.S. v. Windsor,* 133 S. Ct. 2675, 2692 (2013) (quoting

---

[23] Religious individuals and groups whose sacred texts define sexual relationships and marriage traditionally have been the target of increasing animosity, intolerance, and judicial and social defamation. They have been unfairly branded with terms such as "bigot," "homophobe," and as exhibiting hatred or "animus."

*Romer v. Evans*, 517 U.S. 620, 633 (1996)). But unlike *Romer*, the state laws here limiting marriage to one man and one woman are neither unusual nor do they fail to be rationally related to states' legitimate public interest in regulating male- female relationships and their unique procreative possibilities. In *Romer* however, because the state had no valid reason for exempting only gays from anti-discrimination protections, the law was found to be "born of animosity toward" gays and suggested a design to make gays "unequal to everyone else." *Romer,* 517 U.S. at 634–35. And unlike *Windsor*, here there is no federal deprivation of a marriage status granted through a State's authority over domestic relations, and thus, there is no basis for the Court inferring that the purpose of the state law is to "impose a disadvantage"/"a separate status"/"a stigma" on gay couples. *Windsor* 133 S. Ct. at 2692- 95.[24]

Amicus asserts that heightened scrutiny should be applied under the Equal Protection clause to laws involving sexual orientation, nor that state laws limiting marriage to one-man and one-woman are not rationally related to legitimate purposes. The Amicus takes it a step further and attests that sexual orientation statutes cannot be applied whatsoever, since they are religious in nature an violate lemon from every angle.  Amicus believes that homosexuality, polygamy zoophilia, and objectophilia are religious in nature. That they are ideological self-asserted identity narratives stemming from the church of moral relativism/Secular Humanism.  There is no question that legally recognized sodomic marriage is a non-secular sham. Sodomic marriage is a political power play and an assault on the self-evident absolute truth. So is CADA. The fact

---

[24] The reasoning in cases like *Windsor, Romer,* and *Obergefell*  is so intellectually dishonest that the decisions themselves are conclusive proof that legally recognized gay marriage is a non-secular sham that violates prong one of lemon.

that ADF has never even attempted to argue that CADA is an indefensible weapon used to advance the religion of secular humanism has been inept.

The Center for Garden State Families brings to this honorable Court's attention the fact that ex-gays have themselves suffered significant discriminatory "animus" and endured "disadvantage," "separate status," and "stigma," at the hands of self-identified gays. This is because the testimony of ex-gays is fatal to the fiction that sexual orientation is a matter of civil rights and not a matter of religion.   Although there is extensive evidence confirming sexual orientation's fluid and transient nature, the widely embraced theory by secular humanist that same-sex attraction must be a fixed and "immutable" "accident of birth," contributes greatly to animus against ex-gays. This is because the very existence of former homosexuals undermines this popular yet false cultural narrative regarding the purportedly fixed origins of same-sex attraction. Amicus posits that the gay "immutability" myth was developed and fostered as a bold but clumsy attempt to analogize the GLBT movement with the African American struggle for civil rights and equal protection in order to appropriate its cultural moral authority.  There is no question that gay marriage policy and CADA are the result of jaded imperialistic power plays that are rife with a sense of smug moral superiority syndrome that were created through the impeached philosophy that "the ends justify the means."

Former homosexuals are perhaps the last invisible minority group in America today.[25] Ex-gays are reviled, ridiculed, and marginalized simply because they exist.[26] Consequently, many ex-gays and their supporters are forced to remain closeted, on the fringes of American

---

[25](http://www.nytimes.com/2011/06/19/magazine/my-ex-gay-friend.html?pagewanted=all&_r=0 )

[26](http://www.christianpost.com/news/former-gay-activist-marries-woman-addresses-critics-who -condemn-his-new-heterosexual-lifestyle-110736)

culture, because of fear of societal disapproval and stigma.  It is true that individuals have experienced homosexuality differently and theories of the "causes" of same-sex attraction vary greatly. The same is true of those who engage in sexual voyeurism or who cultivate a taste for child pornography.  If one's sense of personal well-being is dependent on all other people who have experienced same-sex attractions having had an identical "gay experience," then that person is in a precarious position, because actual experiences vary significantly. The fact remains that some doors in life are better left unopened and it is flagrantly unconstitutional under the Establishment Clause for the government to promote questionably moral, questionably legal, and questionably real sexual lifestyles that do not even check out with the natural human design as a matter of self-evident observation.

Unsurprisingly, although gay organizations advocate for the "sexual liberty" rights of homosexuals, lesbians, bisexuals, transgenders, transsexuals, and the intersexed, they do not add 'ex-gay' to their list of the aggrieved and nearly uniformly oppose ex-gay rights.[27] Yet the inclusion of ex-gays ensures tolerance for all segments of our society. Acknowledging the ex-gay community exists and is worthy of respect and dignity does not mean that one is disloyal to the gay people we all know and love.

Due to its political powerlessness and a near singular focus on GLBT rights, the ex-gay community finds that Americans are not generally unaware of the widespread intolerance practiced against those who leave homosexuality. Here are some poignant examples: (1) Transgender individuals are affirmed for changing their gender, but ex-gays are ridiculed for

---

[27] Amicus is not aware of a single gay rights organization in the United States which supports the equal rights of the ex-gay community. Like all peoples, former homosexuals want to be open and safe at work, in their community, and in the public square.

changing their sexual orientation. (2) African American ex-gay Grammy winner Donnie McClurkin was removed from singing at a Martin Luther King memorial concert following complaints by gay leaders.[28]  Self-identified Gay leaders also criticized then-presidential candidate Barack Obama for allowing Donnie McClurkin to sing at a fundraiser and insisted that he drop the singer from the program.[29] (3) The World Bank removed Amicus, a non- profit corporation, from its charitable fundraising program after receiving complaints from the Human Rights Campaign, a pro-gay activist organization.[30] (4) In response to complaints from gay organizations, Washington D.C. Mayor Adrian Fenty apologized for issuing a certificate of appreciation to an ex-gay organization. Yet in signing gay marriage legislation for the nation's capital, the mayor had promised equality for all D.C. residents.[31] (5) Ex-gays and their supporters are routinely denied inclusion in all realms of society and access to public venues. Following complaints from local LGBT groups, an ex-gay billboard endorsing change and tolerance for all was taken down after three days in Tucson; the Montgomery County Maryland public school system amended its community flyer distribution program to prevent an ex-gay organization from participating; ex-gay conferences and events are frequently picketed; and a metropolitan transit authority cancelled its free public service advertising to prevent ex-gay organizations from participating.  (6) Gay rights groups are now wielding their considerable political power to aggressively oppose and outlaw much needed counseling and therapy for men, women, and youth who struggle with unwanted same-sex attraction. These activities are carried on by

[28](http://www.christianpost.com/news/ex-gay-community-baptist-leadership-say-dc-officials-are-infringing-on-pastors-civil-rights-102212).
[29] (http://www.youtube.com/watch?v=A3jkeTdgLrg).
[30](http://www.hrc.org/press-releases/entry/hrc-to-world-bank-remove-pfox-from-your-community- connections-campaign).
[31](http://voices.washingtonpost.com/dc/2010/04/fenty_apologizes_for_honoring.html).

organizations like The National Center for Lesbian Rights,[32] Southern Poverty Law Center,[33] and Human Rights Campaign.[34]

These intolerant and discriminatory actions by LGBTQ activists "impose[s] a disadvantage, a separate status, as so a stigma" on gays who want to overcome unwanted same-sex attractions and former homosexuals who have successfully done so, "demean[ing]" and "humiliate[ing]" ex-gays. *Windsor*, 133 S. Ct. at 2693-94. Every day brings new hostile acts against former homosexuals, a politically unpopular group. This irrational prejudice against those who have overcome unwanted same-sex attractions perpetuates misunderstanding and harm against the ex-gay community. It also demonstrates a disregard for diversity and a refusal to respect basic human rights of dignity and self-determination. Unfortunately, recent judicial victories in same-sex "marriage" cases have empowered and emboldened words and acts of animus by loosely equating the legalization of same- sex marriage with proof of gay "immutability," providing further justification for the unfounded viewpoint that ex-gays "do not exist" and, therefore, should be ignored or banished from society and not allowed to participate in the marketplace of ideas and commerce.[35] The negative stereotyping by gay activists of ex-gays is a sad end to the long struggle for tolerance by the gay community; the oppressed have become the oppressors. That ex-gays and their supporters are now the targets of the same people who, until recently, were victimized themselves, demonstrates the tremendous political power and social acceptance of gays and lesbians. Yet, in spite of the significant and real animus ex-gays suffer, Amicus does not concur that unfounded claims of hatred or animus should be

---

[32] (http://www.nclrights.org/explore- the-issues/bornperfect/)
[33] (http://www.splcenter.org/conversion-therapy)
[34] (http://pfox- exgays.blogspot.com/2012/05/wacky-wayne- besen.html).
[35] (http://www.huffingtonpost.com/alec- fischer/this-is-what-happened- whe_1_b_6068712.html)

Case No. 1:17-cv-01666-WJM-NYW   Document 87   filed 10/05/17   USDC Colorado   pg 33 of 37

used as an excuse to redefine the important institution of marriage. Indeed, the Sixth Circuit, exhibiting appropriate judicial humility and restraint, recognized its inability to attribute animus to millions of voters: "If assessing the motives of multimember legislatures is difficult, assessing the motives of all voters in a statewide initiative strains judicial competence." *DeBoer*, 772 F.3d at 409. Thus, this honorable Court must not be quick to disparage, demean, and disrespect, with that monstrous moniker "animus," the good citizens of states whom have determined, for any number of legitimate reasons by participating in the democratic process, that marriage should remain defined as it always has been because marriage policies between one man and one woman are secular and actually accomplish the purpose for which they were made. To assume that prejudice or hatred is the primary driving force in maintaining marriages' traditional form, unnecessarily defames millions of taxpayers in the United States who do not want their dollars going towards entangling the government with the religion of secular humanism.

## CONCLUSION

This Court lacks subject matter jurisdiction to enforce CADA for violating lemon under the Establishment Clause for creating an indefensible legal weapon and for excessive entanglement with the religion of Secular Humanism-Moral Relativism. All prior cases that pretend that sexual orientation is a matter of civil rights and not of religious mythology must be overruled by seeing the truth in light of the evidence. The First Amendment Establishment Clause tells all 50 states that at the very most the only form of religion that is secular and recognizable is marriage between one man and one woman. All other marriage policies are shams that cultivate an indefensible legal weapon used to persecute non-observers and manage to entangle the government with the disproven truth claims floated by the self-serving church of

Secular Humanism. *Obergefell v. Hodge*, 192 L. Ed. 2d 609 (2015), like *Roe v. Wade*, 410 U.S. 113 (1973), lacked a single sentence of sound legal reasoning and can only be described as fraudulent and intellectually dishonest. Same-sex attraction is not an immutable characteristic determined at birth, like race or gender.  For any government official to pretend otherwise for political purposes makes them unfit for office for engaging in racism in kind that manages to be both racially and sexually exploitative. Sexual orientation is merely a political power play that is eroding actual liberty interests that are protected by the United States Constitution. One thing that ex-gays want others to know is that "if they have opened the door and have been seduced into the LGBTQ ideology that they too can convert to a new identity narrative by opening the door to a greater radically transformative truth." After all, the truth sets us free, not shallow cultural narratives that are always narrow, exclusive, dated, and on their way out.  The growing public acknowledgment of ex-gays and the personal testimonies of the individuals included above demonstrate that same-sex attraction is a phenomenon that can and does change. Sadly, because their very existence undermines the immutability narrative, ex-gays have been treated with hatred and disrespect by gay activist organizations. Homosexual sexual orientation is not pre-determined and fixed by "the accident of birth," but is in fact subject to alteration and change. This brief should be accepted because Alliance Defending Freedom has financial reasons to not zealously defend their clients under the correct Constitutional narrative. In that respect, the amicus filer favors an outcome for the Defendants. However, if the Court - as a matter of ego - wants to save gay marriage and CADA by finding that self-identified homosexuals can enforce CADA, the self-identified polygamists and machinists must be permitted to do so as well. It is not complex. But it is how the Constitution works.

/s/Anna C. Little, Esq./
Attorney at Law
426 Route 36, suite 3
PO Box 382
Highlands, NJ 07732
732 708 1309, 732 391 2134 fax
anna@annaclittleesq.com
www.annaclittleesq.com
Attorney For Amicus Curiae


## CERTIFICATE OF SERVICE

A true copy of the foregoing will be served electronically via ECF upon all counsel of record and is also being served via First Class Mail and/or electronic mail upon the following on this the 29th day of September 2017: Jacob Paul Warner Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: jwarner@ADFlegal.org ATTORNEY TO BE NOTICED Jonathan Andrew Scruggs Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: jscruggs@ADFlegal.org ATTORNEY TO BE NOTICED Katherine Leone Anderson Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: kanderson@ADFlegal.org ATTORNEY TO BE NOTICED Kristen Kellie Waggoner Alliance Defending Freedom 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Email: kwaggoner@adflegal.org ATTORNEY TO BE NOTICED Samuel David Green Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: sgreen@ADFlegal.org ATTORNEY TO BE NOTICED

/s/Anna C. Little, Esq./
Attorney at Law
426 Route 36, suite 3
PO Box 382
Highlands, NJ 07732
732 708 1309, 732 391 2134 fax
anna@annaclittleesq.com
www.annaclittleesq.com
Attorney For Amicus Curiae

## IN THE UNITED STATES DISTRICT COURT DISTRICT OF COLORADO

| | | |
|---|---|---|
| **JOAN GRACE HARLEY, CHRIS SEVIER, JOHN GUNTER JR, WHITNEY KOHL,**<br><br>*Plaintiffs*<br><br>**V.**<br><br>**MASTERPIECE CAKE SHOP LTD., JACK PHILLIPS**<br><br>*Defendants* | | **Case No: 17-cv-1666**<br><br>**Judge Martinez**<br><br>**Magistrate Judge Wang** |

## MOTION TO STAY AND NOTICE THAT THE PLAINTIFFS WILL NOT OPPOSE LEAVE TO GROUPS SEEKING TO FILE AMICUS BRIEFS

NOW COMES, Plaintiff Gunter seeking to stay this action until the USSC resolves a second motion to intervene and stay in 16-111. The grounds for this motion are set forth in the attached motion to intervene and in the first motion to intervene. Both motions are in the process of being docketed. If CADA is unconstitutional then that should be determined in the lower court even if it wrecks Alliance Defendant Donations scam to profiteer off of controversies that it knows to be unconstitutional. While persecution is good for their business, it is bad for the rule of law. The Plaintiffs - of course - want to recover here but if and only if it is determined whether CADA is good law as applied to all individuals based on their self-asserted sexual orientation and not just self-identified homosexuals. The Plaintiffs do not oppose leave sought by amicus filers, even if they oppose the Plaintiffs interests or otherwise. Furthermore, it is amazing that churches and pastors will be coming out against Alliance Defending Donations due to their spectacular focus on their person interests and not the interests of their clients and obligations owed to the Constitution.

/s/John Gunter/
SPECIAL FORCES OF LIBERTY
2310 City Center Ct,
West Valley City, UT 84119
rougeattorneyatlaw@gmail.com
G3 Foxtrot Uniform

## CERTIFICATE OF SERVICE

A true copy of the foregoing will be served electronically via ECF upon all counsel of record and is also being served via First Class Mail and/or electronic mail upon the following on this the 29th day of September 2017: Jacob Paul Warner Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: jwarner@ADFlegal.org ATTORNEY TO BE NOTICED Jonathan Andrew Scruggs Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: jscruggs@ADFlegal.org ATTORNEY TO BE NOTICED Katherine Leone Anderson Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: kanderson@ADFlegal.org ATTORNEY TO BE NOTICED Kristen Kellie Waggoner Alliance Defending Freedom 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Email: kwaggoner@adflegal.org ATTORNEY TO BE NOTICED Samuel David Green Alliance Defending Freedom-Scottsdale 15100 North 90th Street Scottsdale, AZ 85260 480-444-0020 Fax: 480-444-0028 Email: sgreen@ADFlegal.org ATTORNEY TO BE NOTICED

/s/John Gunter Jr./